OPINION OF THE COURT
Kristin Booth Glen, J.
In enacting chapter 349 of the Laws of 1982, the new Loft Law (Multiple Dwelling Law, art 7-C), the Legislature intended to “prevent uncertainty, hardship, and disloca *854 tion” of loft dwellers in this city (Multiple Dwelling Law, § 280). The law as written, however, at least initially fails in this goal because of a number of substantial questions which it leaves unanswered. This case presents such a major question — i.e., whether, or under what circumstances, the term “residential occupant” includes subtenants, and the subsidiary question, who shall decide. These issues can best be discussed in the context of the specific factual situation of this case, which will be summarized after a brief discussion of the law.
THE NEW LAW
The 1982 Loft Law was intended to remedy a number of problems[1] which arose from the illegal conversion of commercial and manufacturing loft space to residential use. One such problem was the “uncertain” status of loft residents who generally occupy their space pursuant to commercial leases, under expired leases, or no leases at all — all outside the ordinary residential system of rent control and rent stabilization. Another was to secure compliance with minimum legal standards of safety and habitability in buildings which were, in fact, if not by law, multiple dwellings — and to do so in a way which would reasonably and fairly pass on the costs of obtaining such compliance to those who benefited from it. Yet another was to adjust and control the relations of landlords and tenants during the period of transition to compliance, by guaranteeing tenants continuing occupancy while allowing landlords to sue for rent in the event of nonpayment.[2]
This latter goal was accomplished by the creation of a classification of “interim multiple dwellings” which were defined in subdivisions 1 and 2 of section 281 of the *855 Multiple Dwelling Law.[3] Once a building is found to be an “interim multiple dwelling” the law provides, “Prior to compliance with safety and fire protection standards of article seven-B of this chapter, residential occupants qualified for protection pursuant to this article shall be entitled to continued occupancy, and shall pay the same rent, including escalations, specified in their lease or rental agreement to the extent to which such lease or rental agreement remains in effect or, in the absence of a lease or rental agreement, the same rent most recently paid and accepted by the owner” (emphasis added). (Multiple Dwelling Law, § 286, subd 2.)
In other words, there can be no eviction or other displacement of “residential occupants” of interim multiple dwellings other than for nonpayment of rent.[4] Holdover proceedings based on illegal occupancy or occupancy in violation of commercial lease terms are specifically prohibited (Multiple Dwelling Law, § 286, subd 1), as by implication, are holdovers based on expiration of leases (§ 286, subd 2; SWS Realty Corp. v Prosch, NYLJ, Nov. 17, 1982, p 4, col 6). Given this legal framework, the facts in the instant case may now be considered.
FACTS
Respondent Leota Diane Duncan (Duncan) occupies apartment No. 301 of premises located at 874 Broadway in Manhattan. The building is owned by the MacIntyre Building Corporation; Duncan’s leases, since her first in 1976, have shown Leonard Dworkin and Barry Safran (Dworkin and Safran) as landlord. Paragraph 13 of the rider to the original lease states that “the tenancy herein is a subtenancy. For purposes of this sub-tenancy, all previous references in this Lease to ‘Landlord’ shall be deemed *856 to read ‘Tenant’; all previous references to ‘Tenant’ shall be deemed to read ‘Sub-Tenant’.”
The last extension of Duncan’s lease expired on June 30, 1982. Since that date she has tendered rent, but her checks have been returned. On July 16,1982 Dworkin and Safran commenced a holdover proceeding alleging expiration of the lease and requesting possession and use and occupancy from the termination date.
THE MOTION TO DISMISS
Duncan moves to dismiss the petition on a number of grounds, including the applicability of the new law to her tenancy. The majority of her arguments can be disposed of briefly, with the final issue of the Loft Law’s coverage reserved for more extensive discussion.
Duncan argues that the petition is jurisdictionally defective for failure to allege a multiple dwelling registration (MDR) number, that as a rent-stabilized tenant she is entitled to a renewal lease as a matter of law, that the petition is invalid for failure to include a necessary party, the MacIntyre Corporation, and that the demand for rent is invalid. While each of these arguments involves the Loft Law or its ramifications in some way, no extensive discussion is necessary for their disposition.
First, although “owners” may not sue for rent in summary proceedings without alleging an MDR number[5] (see, e.g., 22 NYCRR 2900.21 [f]), the petitioners are not the owners of the building.[6] As such, the Appellate Term has held, the failure to allege an MDR number is not a jurisdictional defect {Eng v Roth, NYLJ, Feb. 8, 1982, p 6, col 1 [App Term, 1st Dept]).[7]
*857 Second, the question of Duncan’s entitlement to the protection of the Rent Stabilization Law (Administrative Code of City of New York, ch 50, tit YY) which might previously have rendered, the petition jurisdictionally defective (see, e.g., Mandel v Pitkowsky, 102 Misc 2d 478 [App Term, 1st Dept], affd 76 AD2d 807), has been subsumed under the new law, which provides for a transition to rent stabilization coverage after a building attains article 7-B compliance.[8] Accordingly, the failure to allege a Rent Stabilization Association membership and/or to comply with the law regarding rent-stabilized tenants is not a total defect in this petition.
Third, to the extent that Dworkin and Safran are lessees of the space which Duncan occupies, they are proper parties to bring this petition and the owner of the building itself clearly need not be added. This holding, however, in no way affects the ultimate determination as to whether the petition may be brought at all.
Finally, Duncan mischaracterizes the claim for money made in the petition. Of course, if the petition — or the petitioners — demanded rent subsequent to bringing a holdover proceeding, they would in effect be reinstating the tenancy they claim previously terminated, thus invalidating the petition. Here, however, the demand is not for rent, but for reasonable use and occupancy, in accordance with the terms of the lease, for the period in which Duncan allegedly held over. This is permissible, and does not make the petition jurisdictionally defective, nor is the request for money as use and occupancy itself barred.
Disposition of these matters leaves the major issue raised by Duncan — whether the proceeding is barred by subdivision 2 of section 286 of the new law or whether, as Dworkin and Safran argue, that section is inapplicable *858 because the relationship between petitioners and respondent is one of prime tenant/subtenant. This in turn requires consideration of the undisputed facts concerning the relationship of the parties to each other and to the premises.
Dworkin and Safran are not strangers to the ownership of the premises. In fact, as a co-operative offering plan dated March 15,1982 indicates, they and six others are the actual sponsors of the plan and the principals of the MacIntyre Corporation which owns the building. The plan indicates that each and every apartment in the building is leased by MacIntyre to one, or a combination of the sponsor/principals. Dworkin, for example, is shown as the lessee of all three apartments on the eighth floor, Safran of all three apartments on the fifth floor, Dworkin and Safran of all three apartments on the third floor — including Duncan’s, Dworkin, Safran and Mark Halberstadt as lessees of two of the three apartments on the seventh floor.
The prospectus lists all of the units in the building with their lessees and a notation of the way in which they and the shares attributable to them are held. One notation, an asterisk, is explained as follows: “These Units are occupied by the respective individuals indicated who are present shareholders of The MacIntyre Building Corporation and Sponsors of this Offering Plan. As of the date this Offering Plan is declared effective, the respective individuals indicated shall constitute the owners of their respective Units” (emphasis added).
There are asterisks next to all three fifth floor apartments of which Barry Safran is shown as lessee, and asterisks next to Nos. 801 and 807 of which Leonard Dworkin is shown as lessee, as well as No. 305 (Safran and Dworkin) and No. 705 (Safran, Dworkin and Halberstadt).
There are two notations, a plus sign ( + ) and an equal sign ( = ) next to the apartment occupied by Ms. Duncan. They are described as follows:
“ + These Units are attributable to unsold shares as such term is defined above in the section entitled ‘Unsold Shares’. The individuals indicated as the lessee of each *859 Unit shall be the initial proprietary lessees for the respective Units and the sole individuals who will receive the proceeds from a sale of the respective Units.
“= These Units are not presently offered for sale and will be covered by commercial leases until a residential variance is issued for them as set forth at page 6 above.”
In other words, the petitioners here are self-described as the “occupants” of numerous other apartments in the building, but not of Ms. Duncan’s apartment. She, it is undisputed, is the occupant of her apartment; it is further undisputed that her occupancy has been “residential” for some years. Does she then, however, cease to be the “residential occupant” entitled to protection of the new Loft Law simply because the prime lease to her apartment is held by another entity? On the law and the facts of this case, the answer is no.
THE LAW
In drafting the Loft Law, the Legislature was deliberately vague in its use of the term “residential occupant” rather than “tenant” for two reasons. The first was the difficulty of reaching a consensus among the various interest groups involved in the legislation;[9] the second was the enormous variety of transactions and relationships which characterize the present loft situation in New York City.[10] The latter suggests the complexity of the problems which will confront Housing[11] and Civil Court Judges and the Loft Board[12] in cases such as this.
*860 The spectrum of relationships which may legally be characterized as prime tenant/subtenant is an extremely broad one on which the location of “residential occupant” cannot always be determined by a bright line."At one end is the classic tenant/subtenant situation where, for example, an artist has lived in a loft for many years and has sublet for two months during the summer while s/he is teaching out of the city. On the other end is the entrepreneur who has leased tens of thousands of square feet of raw loft space, subdivided and improved it, and “subleased” it to numerous tenants at great profit.
In each situation there is, according to the agreement between the parties, a tenant/subtenant relationship. Yet to blindly apply that legal status in the loft situation, as the petitioners would have this court do, would lead to results which are far from the balancing of interests intended under the new law. It is here that the actual language of the statute gives guidance.
A residential occupant is one who both occupies and resides. The latter term suggests at least reasonable permanence of fact and intention, and the former speaks of possession. While the two-month summer subtenant may actually occupy the loft on the sixtieth day of the subtenancy, there was presumably never any intent on the part of either party that s/he was other than temporarily “residing” there, or that s/he would continue to so reside. To suggest that the “prime” tenant, whose home the loft has been, may not enforce her or his agreement and that the summer subtenant is “protected” in perpetuity is . clearly absurd.
A different result is reached as to the second example. To permit eviction of the person who is the present occupant and who has been the only resident of a loft for the years since it was converted from raw space solely on the petition of the so-called prime tenant would be not only unjust, but clearly outside the contemplation of the new law.
Where a tenant/subtenant relationship is alleged, what is called for is no less than individual case-by-case determination of who is the “residential occupant” of any particular loft otherwise covered by the law. Fortunately, how *861 ever, in this determination, the courts and the Loft Board need not “re-invent the wheel”, since there already exist analogous bodies of law dealing with similar, though hardly identical problems.
One such area involves illusory or “phantom” prime tenants in proceedings pursuant to the Code of the Rent Stabilization Association of New York City, Inc. The CAB has consistently ordered that renewal leases be offered to so-called “sub” tenants where the “prime” tenancies have been found to be “illusory” and designed to evade the provisions of the Rent Stabilization Law and Code[13] as where the “prime” tenants are employees or otherwise within the direct control of the owner. (See, e.g., Matter of Hiyee Realty Corp., NYLJ, May 5, 1982, p 6, cols 1, 3; CAB Opn No. 17213 [complaint of Adamo and Thorin, July 23, 1981]; CAB Opn No. 17244 [complaint of Doll, July 23, 1981].) In such cases the CAB and the courts have looked behind the language used by the parties to determine the real relations between them, even though the statute itself uses the word “tenant” in determining the protections it affords.
There is also a host of cases involving the determination of “primary residence” for purposes of coverage of the rent control law.[14] Here the indicia of residence include the tenant's intent, the location of his or her furniture and personal belongings, and the reason for his or her absence from the premises where such absence is alleged as an abandonment. (See, e.g., Matter of Nostra Realty Corp. v Joy, NYLJ, Jan. 16, 1981, p 4, col 1.)
This list is hardly meant to be exhaustive, nor should it be assumed that the rights protected, the statutory definition and the relevant criteria are interchangeable. Rather, *862 the point is that administrative agencies and courts on initial determination may look to the reality of a particular housing matter in determining rights and obligations under the, applicable statute.[15]
Here, unlike the analogies discussed, the court has e^ren greater flexibility. Under the Loft Law we are not constrained by the word “tenant”, but are instead given the more elastic term “residential occupant”, a term whose intention was clearly to free triers of fact from the strictures of more traditional and stable housing arrangements.[16] Drawing from the case law discussed, and from the general intention of the Loft Law itself, a number of criteria may be important, or indeed dispositive in determining who is the “residential occupant” where a prime/ subtenant relationship is alleged. These include:
(1) Who is actually occupying the loft, and for what term?[17]
(2) Is that occupancy the primary residence of the person in possession? Of the lessee alleging prime tenancy?[18]
(3) Has the person alleging prime tenancy ever actually resided in the premises or is s/he only the lessee?
(4) Is the person alleging prime tenancy the lessee of more than one noncontiguous unit in the building?[19]
*863 (5) Is the person alleging prime tenancy a principal, employee or agent of the owner so as to raise a presumption of “illusory” or “fictitious” tenancy?
Regardless of how the individuals are denominated on a lease or “sublease” executed prior to the enactment of the Loft Law, where there is a real dispute as to the “residential occupant” entitled to protection, a determination must be made on factual considerations such as these.[20]
CONCLUSION
Applying these criteria to the instant case, it is clear that the so-called subtenant, Leota Diane Duncan, is the “residential occupant” of apartment No. 301. She presently occupies those premises and has done so continuously since 1976. There is no showing that she has any other residence and her intent that this is her primary and sole residence is clear. On the other hand there is no showing that Safran and Dworkin have ever occupied the premises; to the contrary, the prospectus for co-op conversion lists them as “occupying” numerous other contiguous and noncontiguous units in the building, individually and in various combinations. Finally, they are principals of the owner, and sponsors of the co-op plan. There is no evidence from which it can be found that they are, or ever have been, the residential occupant of apartment No. 301, while the evidence is equally clear that Ms. Duncan is.
Accordingly, pursuant to subdivision 2 of section 286 of the Loft Law of 1982, respondent is entitled to continued occupancy of the premises, and the petition is dismissed.

. The discussion which follows is not a complete list; issues of the protection of manufacturing facilities and jobs, and sensitivity to local zoning determinations were also of great importance in drafting and enacting the law.

. Prior to the new law, loft landlords were unable to bring summary proceedings because they lacked multiple dwelling registration numbers (Multiple Dwelling Law, §§ 302, 325; see, e.g., Lipkis v Pikus, 99 Misc 2d 518 [App Term, 1st Dept], affd 72 AD2d 697); the only way they could secure payment of rent from their tenants was to cut services, have the tenants bring an injunctive action and have the court condition the injunction on the payment of rent. (See Corns v 129 Front Co., 85 AD2d 176.) This was, as the Corris court pointed out, unsatisfactory from the standpoint of all parties, causing the court to call on the Legislature for resolution.

. Briefly, these subdivisions require a showing that the building was formerly used for commercial or manufacturing purposes, that there is no certificate of occupancy, and that at least three separate occupants or sets of occupants lived residentially in the building on April 1, 1980 to December 30,1981. The building must also be located in an area where, broadly speaking, residential occupancy is or may be permitted by local zoning regulations. On the undisputed facts presented in the papers in this case, I find the premises in question to be an interim multiple dwelling.

. Subdivision 1 of section 285 specifically authorizes owners to bring actions or summary nonpayment proceedings for the collection of rent.

. This is, of course, only a shorthand way of stating the statutory obligation of landlords to register multiple dwellings with the Department of Buildings, Office of Code Enforcement, which results in the issuance of a multiple dwelling registration (MDR) number.

. The fact that, as discussed infra, petitioners are principals of the owner, is, under case law, not relevant to the owner/nonowner distinction, although it may be to the true/illusory prime tenant dichotomy.

. Duncan argues that Eng is an anomaly both in terms of prior case law and the clear language of the applicable rule, which specifically speaks of “petitioners”, not *857 owners. While the argument is an appealing one, its consequences are substantially lessened by passage of the new law. This court is, in any event, bound to follow the decision of the Appellate Term.

. Significantly, Duncan’s complaint filed with the CAB was forwarded to the Department of Housing Preservation and Development, which in turn forwarded it to the Mayor’s Office of Loft Enforcement. The latter has referred it to the Loft Board with a letter indicating that if the building is covered by the new law, the Loft Board and possibly the court will ultimately determine issues of coverage and compliance under that law.

. The entire law and many of its obvious “loopholes” were the result of the compromises necessary to obtain some agreement among representatives of loft owners, loft tenants, manufacturing and governmental interest groups.

. Remarks of Carl Weisbrod, chairman of the New York City Loft Board and Joseph Fiocca, chief draftsperson of the Loft Law, to a seminar of the Judges of the New York City Civil Court, October 7, 1982.

. There may be a jurisdictional problem with the use of Housing Judges in some situations where the landlord brings an action alleging the premises are commercial because of the loft tenant’s lease. Subdivision (c) of section 110 of the CCA relates only to “housing matters” and Housing Court Judges have traditionally not sat in commercial landlord/tenant parts. Accordingly, where there is an initial dispute as to whether a particular building does or does not come within the Loft Law, a Housing Judge may not be empowered to make the necessary decision.

. On this as on other matters concerning the coverage of the Loft Law, it is clear that the Loft Board does not have exclusive jurisdiction.

. Subdivision A of section 62 of the Code of the Rent Stabilization Association of New York City, Inc., provides that the stabilization of rents and other code requirements “shall not be evaded, either directly or indirectly”. The cited cases involve findings that the issuance of “leases” to fictitious prime tenants is a practice in violation of subdivision A of section 62 and that the alleged subtenants are the “real” prime tenants entitled to protection of the act.

. Section 18 of the New York City Rent and Eviction Regulations provides that an apartment may be decontrolled if it is found that a tenant has established a primary residence elsewhere.

. This is, of course, precisely what courts did in establishing the category of “de facto multiple dwelling” which ultimately led to the passage of the law here at issue. (See p 854, n 2, supra.)

. In a letter submitted as an exhibit by respondent, Assembly Member Steven Sanders, a member of the Subcommittee on Lofts and the Standing Committee on Housing states:
“it was the absolute and unqualified intent of the Legislature in its wisdom to extend the tenant protections in the law to all residential occupants in Interim Multiple Dwellings regardless of any prior technical legal status as ‘tenant’, ‘subtenants’, or any other status * * *
“Furthermore, it was to a large degree precisely the complexities of the previous legal/illegal status of loft tenants which necessitated this emergency legislation action culminating in the bill’s passage into law”.

. Here for example, the two- or three-month summer occupancy on a five-year lease might prove dispositive.

. Here one might look both to intent and history, and to actual physical conditions — i.e., whose furniture and possessions were in the loft.

. Noncontiguous units would raise a presumption that at best the lessee intended one as her or his residence, on the assumption of classical physics that a body can only occupy one space at one time.

. Such determinations may, of course, require hearings or may, as here, be made solely on the uncontroverted facts set forth in the papers.