OPINION OF THE COURT
Martin Evans, J.
In this CPLR article 78 proceeding, petitioner seeks an order annulling the decision of the Conciliation and Appeals Board, which granted subtenant Brundin the status of a prime tenant. Brundin thereby became entitled to a *810 renewal lease under the Rent Stabilization Law (Administrative Code of City of New York, § YY51-1.0 et seq.) and restitution of rent overcharges. Petitioner alleges that the Board’s decision was illegal, arbitrary and capricious.
At issue is a question that has never been definitively analyzed by any officially reported case. Is a tenant who rents an apartment not for his own use but for the express purpose of subleasing for profit, a legitimate prime tenant entitled to the protection of the rent laws, or is he an “illusory prime tenant” not entitled to such protection?
FACTS
Petitioner Hutchins leased apartment 2C from the landlord for a period of three years commencing November 21, 1980 and ending November 21, 1983. The apartment was located at 166 Elizabeth Street, in lower Manhattan. He subleased the apartment for a period of four and a half months to Brundin commencing August 15, 1982 and terminating December 31, 1982. The owner had charged petitioner the stabilized rent of $202.30 per month including a 15% subletting allowance; petitioner, however, charged Brundin $400 per month, a nearly 100% profit over the stabilized rent. Meanwhile, Hutchins resided at 20 Spring Street. Petitioner also leased apartment 3B from the landlord for a period of two years, commencing April 1, 1982 and terminating March 31, 1984, at a rental of $327.50 per month. He subleased the apartment to Lewis for the term of the lease at a rental of $400 per month in excess of that permitted by law. Petitioner also collected here a profit.
Upon refusal of the petitioner to renew or extend Brundin’s sublease, Brundin filed a complaint with respondent. Brundin sought independent status as a prime tenant with possessory rights to the apartment and lease renewal under the terms that the prime tenant had with the owner. Brundin claimed petitioner was a “fictitious prime tenant” who never occupied the apartment but sublet it at an increased rental solely to make a profit.
Respondent claims to have notified petitioner of the proceedings to determine the complaint. Respondent alleges that a letter notifying petitioner was sent to petitioner and that he failed to respond within the 30 days *811 indicated. Petitioner alleges that he received no notice. Based on the available evidence and noting petitioner’s failure to answer, the Conciliation and Appeals Board found petitioner to be an “illusory tenant” and that he had violated the law by overcharging Brundin a rent in excess of the one he paid to the landlord while he resided in another building. Respondent therefore terminated petitioner’s leasehold and granted Brundin a refund and a renewal lease as a prime tenant.
Petitioner here seeks an order nullifying the Conciliation and Appeals Board opinion and compensatory and punitive damages in the amount of $100,000. Monetary damages may be sought in an article 78 proceeding. CPLR 7806 provides: “[a]ny restitution or damages granted to the petitioner must be incidental to the primary relief sought by the petitioner, and must be such as he might otherwise recover on the same set of facts in a separate action or proceeding suable in the supreme court against the same body or officer in its or his official capacity.” Petitioner here has not demonstrated a sufficient substantive basis for the monetary relief sought and so these claims are accordingly severed and dismissed.
ILLUSORY TENANCY
The term “illusory tenant” has become a term of art in the course of both judicial and administrative interpretation.[1] It denotes a lessee of residential premises who does not occupy the premises for his own residential use and who subleases it for profit, not because of necessity or other legally cognizable reason.
The Rent Stabilization Law of 1969, the Emergency Tenant Protection Act of 1974 (L 1974, ch 576, § 4), and most recently, the Omnibus Housing Act of 1983 (L 1983, ch 403) govern rent-stabilized apartments.[2] The New York *812 State Division of Housing and Community Renewal has succeeded the Conciliation and Appeals Board as the administrative body having primary jurisdiction to adjudicate disputes as to both rent controlled and stabilized housing accommodations, and is thus now the correct party respondent.
The subletting of stabilized apartments is governed by the Rent Stabilization Law and the Code of the Rent Stabilization Association of New York City, Inc. (Rent Stabilization Code). The pertinent code provisions are as follows:
“A. Where there has been a subletting of the dwelling unit by the tenant, with the permission * * * of the owner, the stabilization rent payable by the subtenant shall be consistent with the provisions of the Rent Stabilization Law, and the subtenant shall have the rights and obligations of the tenant for purposes of this Code”. (Rent Stabilization Code, § 21.)
“The stabilization rents and other requirements in this Code shall not be evaded, either directly or indirectly, in connection with the renting or leasing or the transfer of a lease of dwelling units by requiring the tenant to pay or obligate himself for membership or other fees, or by modification of the practices relating to payment of commissions or other charges, or by modification of the services furnished or required to be furnished with the dwelling units, or otherwise.” (Rent Stabilization Code, § 62.)
The New York State Division of Housing and Community Renewal (formerly the Conciliation and Appeals Board) has the authority to investigate the relationship between the prime tenant and the sublessee, and has primary jurisdiction to determine the rights of landlords, and subtenants, inter se, and the validity of their relationships as *813 they relate to rent-stabilized apartments. (See Matter of Hiyee Realty Corp. [New York City Conciliation & Appeals Bd.], NYLJ, May 5, 1982, p 6, col 1; Matter of Walsh [New York City Conciliation & Appeals Bd.], NYLJ, Oct. 14, 1982, p 7, col 4.) Even though petitioner was never a member of the Rent Stabilization Association, his landlord was, and the apartments petitioner rented were subject to the Rent Stabilization Law and Code. Respondent thus had the authority to adjudicate the subject complaint.
Although the issue of illusory tenancy has arisen with some regularity, no officially reported case has yet fully analyzed the problem. The term “illusory tenant” has been used to describe two different situations: The first situation involves a strawman, a “tenant”, real or imaginary, who, as the alter ego of the landlord, subleases the apartment as a means of permitting the landlord to circumvent or evade his obligations under the rent laws. In this situation, the illusory tenant is either acting as the landlord’s agent or in cooperation with him.[3] This practice has been found to subvert the rent laws. (Matter of Hiyee Realty Corp. [Conciliation & Appeals Bd.], supra.) In Hiyee, the owner of a rent-stabilized building had an employee lease apartments in his own name. Acting as an undisclosed principal, the landlord then had the employee sublease the apartments at an inflated rental. The Conciliation and Appeals Board found that the employee never occupied the apartment, that the owner itself collected all rents directly from the tenant, and that the owner had demanded similar agreements from several other incoming tenants. The Board, sustained by the court, deemed the employee an “illusory tenant” and found that the subletting was a violation designed to evade the Rent Stabilization Law.
Other cases have arisen in the context of cooperative conversion where a landlord has caused an employee to pose as a prime tenant for the purpose of controlling votes in order to effect the conversion plan. (See, e.g., Yellon v Reiner-Kaiser Assoc., 89 AD2d 561; cf. Stutt v Unique Restorations Co., 96 AD2d 1039 [factual question; remand directed to determine nature of relationship between prime tenant and subtenants].)
*814 The second, and more common, situation of illusory tenancy involves a prime tenant who rents stabilized or controlled apartments and then subleases them as a business. The second type of illusory tenancy was apparently first recognized in Seplow v Conciliation & Appeals Bd. (Supreme Ct, New York County, Asch, J., index No. 100334/75). Petitioner Seplow there conceded the allegation that he was subletting for profit three apartments which were not his primary residence. However, he argued that his leases had been validly negotiated with the prior owner, before the effective date of the 1969 Rent Stabilization Law and constituted a permissible commercial venture not subject to modification by the intervening rent stabilization system, and challenged the Conciliation and Appeals Board application of it to him. The court dismissed Seplow’s petition and found that the owner was not obligated to renew Seplow’s leases, since he was not a primary tenant, relying on subdivision E of section 54 of the Rent Stabilization Code: “The owner shall not be required to offer a renewal lease to a tenant only upon one of the following grounds: E. (1) The owner has established by facts and circumstances which in the judgment of the Conciliation and Appeals Board may have a bearing upon the question of resident, that the tenant in possession maintains his primary residence at some place other than at such housing accommodations.”
In Matter of Sunderland (NYLJ, Nov. 1,1982, p 13, col 3) the subtenant lodged a rent overcharge complaint with the Conciliation and Appeals Board against the then owner of the building. During the Conciliation and Appeals Board’s investigation a cooperative conversion plan for the building was approved. The prime tenant purchased the stock and acquired a proprietary lease for the apartment. The subtenant then commenced an action to rescind the sale, and sought permission to purchase the apartment himself. While this action was pending, the Conciliation and Appeals Board determined that the prime tenancy of petitioner was illusory. The Board found that petitioner never in fact occupied the apartment, instead he “sublet” it to the subtenant 11 days after he rented it. The subtenant paid rent directly to the landlord. The court, in sustaining the *815 Conciliation and Appeals Board, concluded that the subtenant was the actual tenant in occupancy and so should be accorded prime tenant status and afforded the exclusive right to purchase the apartment. It also adjusted the rent charged him based upon comparable rental data in accordance with its procedures.
In Matter of Walsh (New York City Conciliation & Appeals Bd.) (NYLJ, Oct. 14, 1982, p 7, col 4, supra) the subtenant had filed a complaint with the Conciliation and Appeals Board claiming that the prime tenant-sublessor had overcharged her and that the owner had wrongfully refused to grant her a renewal lease as a prime tenant. At the expiration of the lease the subtenant held over. The Conciliation and Appeals Board complaint was served on the owner, who did not respond, and on the prime tenant, Walsh, who denied the overcharge, stating that she had already executed a cooperative purchase agreement for the apartment and that she planned to commence holdover proceedings when the sublease expired. Thereafter, the subtenant commenced an action for a declaratory judgment that the sublease arrangement with petitioner was invalid and that they were the lawful rent-stabilized tenants entitled to a renewal lease. Such a determination would have accordingly entitled them to purchase the rights to the apartment under the cooperative offering. The Conciliation and Appeals Board and the court each found petitioner’s tenancy “illusory” since she never occupied nor intended to occupy the apartment. Rather, she rented the apartment either for profit or to influence the vote and secure the right to purchase in the event of a cooperative conversion. The court implicitly regarded each motive as an improper basis for recognizing prime tenancy status and entitlement to protection under the rent laws.
In Rogal v Conciliation & Appeals Bd. (Supreme Ct, New York County, Evans, J., index No. 21723/82), the court dismissed a challenge to the Conciliation and Appeals Board finding that the prime tenant had rented the subject apartment, among others, for the sole purpose of subletting for profit. In Rogal (supra), the sublessee filed an overcharge complaint with the Conciliation and Appeals Board, claiming that the prime tenant Rogal never occupied the apartment as a residence, and was charging in *816 excess of the legal rental. The owner thereupon filed an application with the Conciliation and Appeals Board for permission to refuse to renew the prime tenant’s lease on the grounds that he did not occupy the apartment as his primary residence. The Board granted the owner’s application and determined that the sublessee was entitled to all the rights of a rent-stabilized tenant.
In Schuller v D’Angelo (117 Misc 2d 528), the prime tenant sought an injunction in which she could toll a lease violation, viz., illegal subletting and claimed that the person occupying her apartment was only a temporary “house guest”. The court denied the application as unnecessary in light of the recently enacted 10-day postjudgment stay provisions of RPAPL 753 (subd 4). The evidence showed that the prime tenant had placed nearly three dozen classified advertisements offering sublets of a variety of apartments in different sizes and locations during the previous two years some of the notices including the wording “many others”. The court could not determine whether any of the advertisements applied to the subject apartments nor whether the rentals complied with applicable law. While a determination of the illusory tenant issue was not necessary, the court noted (117 Misc 2d, at p 529, n 2): “These advertisements strongly suggest that plaintiff may be in the business of acquiring apartments for subsequent rental to others. If this be the case, she very well may not be a legitimate tenant of the subject apartment at all. If she is acting as a landlord, profiteering at the expense of her tenant, from the owner’s capital investment and her own rent-stabilization rights, without affording the same rights to her own tenant * * * then she should be barred by the clean hands doctrine from the equitable relief she seeks here.”
It should also be noted that, in the context of prime tenants’ prospective attempts to sublet or assign, and in the construction of various versions of section 226-b of the Real Property Law, the courts have looked disapprovingly on subletting for profit or other personal advantage, which one court aptly characterized as “the opportunity to trade in apartments”. (Shapiro v Dwelling Managers, 92 AD2d *817 52, 56) .[4] Subletting for reasonable purposes, under appropriate circumstances, is an important and statutorily protected right (see Real Property Law, § 226-b); it is not intended “to create a new class of landlord.” (Vance v Century Apts. Assoc., 93 AD2d 701, affd 61 NY2d 716.) Indeed, the plain intent of the newest amendment to section 226-b, which, inter alia, prohibits assignments without the owner’s consent, is in accord with this view. (See Real Property Law, § 226-b, eff June 30, 1983; L 1983, ch 403 [legislative findings].) A possessory interest in a leasehold is an increasingly important right in today’s constricted housing market. It is not an ordinary commodity to be bought and sold without restriction.
Subletting is permissible on a temporary basis, according to the procedures of applicable law, for the limited purpose of allowing a legitimate residential tenant in actual occupancy to retain his home when a temporary absence becomes necessary. (See Matter of Krantz v Conciliation & Appeals Bd., 57 NY2d 915.) A sublease must be entered in good faith. The parties must be bona fide in order to be held to the terms of the lease. (See Matter of Landerson [New York City Conciliation & Appeals Bd.], NYLJ, July 17, 1980, p 4, col 2.) Bona fides requires mutuality. Both the prime tenant and his subtenant must be legitimate residential tenants in order to claim the protection of the rent laws. Moreover, the prime tenant in subletting must actually intend to return to resume using the apartment as his primary residence. (Russman v Zelda Realty Corp., NYLJ, Aug. 24, 1983, p 6, col 1; see Real Property Law, § 226-b.)
At a time of such grave housing shortage tenants find it increasingly difficult to find adequate housing at a reasonable cost.[5] The illusory tenant artificially manipu-
(n. coni'd) *818 lates an already strained market; he effectively diminishes the pool of stabilized apartments and inflates the general rent level. Conversely, at a time when property owners incur increased costs and are limited by law to a certain level of return, it is anomalous to permit a tenant who has often made no capital investment and who ordinarily incurs minimal operating expenses, to speculate on someone else’s investment, potentially without limitation. Since an illusory tenant is acting contrary to the law he cannot avail himself of its protection. He would therefore not be entitled to primary tenant status and the right to a renewed stabilization lease.
In the case at hand, the evidence adduced compels the conclusion that the Conciliation and Appeals Board determination had a rational basis and was neither arbitrary nor capricious. The Board studied the record and found petitioner to be an illusory tenant. The apartment in question was not his primary residence. He sublet the apartment to complainant Brundin at an inflated rental. He apparently also subleased another apartment in the same manner at an inflated rental. It is undisputed that, at the time of the sublettings, petitioner lived elsewhere. Despite petitioner’s present protestations, there is no evidence that, at the time of the sublease, petitioner intended to occupy either of the apartments as his residence. It thus appears that petitioner has used the subject apartment for commercial purposes. Such commercial use subverts a clear purpose of the Rent Stabilization Law (Administrative Code, § YY51-1.0).
A tenant’s right to possession, particularly of a rent-stabilized apartment, is a valuable right. While the administrative agency has the authority to determine, in the first instance, entitlement to such rights, it must do so rationally, fairly and in compliance with constitutional due process standards. Procedural due process demands that the individual, whose rights are subject to challenge, be accorded fair notice of the allegations against him and an opportunity to be heard. (US Const, 14th Arndt; NY Const, art I, § 6.) Petitioner Hutchins was accordingly entitled to *819 notice and an opportunity to be heard at the Conciliation and Appeals Board hearing.
The remaining question is whether or not respondent properly gave notice to petitioner. Respondent must demonstrate by competent evidence that it actually mailed the notice to petitioner.
Respondent sets forth in the record a copy of a letter, addressed to petitioner at his conceded residence address, dated February 28, 1984, entitled “Notice to Owner”. The letter notifies petitioner of the complaint and the need for his response within 30 days or default.
Respondent is entitled to a conclusive presumption of receipt only if it meets its burden of proving actual and proper mailing. (See Nassau Ins. Co. v Murray, 46 NY2d 828; Caprino v Nationwide Mut. Ins. Co., 34 AD2d 522.) “Proper mailing” requires adequate preparation to permit prompt and accurate delivery by the postal authorities, including proper addressing, stamping and deposit in a United States post office or an authorized depository. (Boyce v National Commercial Bank & Trust Co., 41 Misc 2d 1071, affd 22 AD2d 848.) Only once there is proof that the letter was put into the distributive process can the presumption of receipt arise. (Matter of Kordal v Neisley, 66 Misc 2d 781.)
In the absence of direct evidence, notice may be proven by circumstantial evidence of proper office procedures. However, it is not sufficient proof merely to assert, as respondents have done in the papers before the court, that the general custom of its office is to mail all letters. Rather, there must be proof of a regular office practice of correct preparation of letters and their deposit in a certain depository. If a particular employee has the duty to deposit the mail it must be shown either that he actually deposited that mail or that it is his invariable custom to deposit every letter left for mailing, in the usual depository. (Gardham & Son v Batterson, 198 NY 175; Boyce v National Commercial Bank & Trust Co., supra.)
In the case at bar, the evidence is insufficient for the court to now determine, as a matter of law, that petitioner was given proper notice of the Conciliation and Appeals Board proceedings. Whether or not the letter of notice was *820 duly mailed by respondent to petitioner is a question of fact that must be determined at a hearing. If in the evidence at the hearing, respondent cannot prove that it duly mailed the notice, petitioner would be entitled to a new hearing. Accordingly, the issue of notice is referred to Trial Term Part 10, to hear and report. Counsel shall file a copy of this decision with the office of the referees, room 308M, to schedule a calendar date.
Pending determination the proceeding is held in abeyance.

. The term illusory tenancy was apparently first used in a reported case in 1958. See Kaufman v Zash (12 Misc 2d 329, mod 7 AD2d 927, affd 7 NY2d 831), but in a wholly different context: there a surviving husband unsuccessfully claimed that his deceased wife’s deed of real property to herself and a daughter as joint tenants, amounted to an “illusory” tenancy intended to frustrate his distributive share. In its current, different use, the term is, however, conceptually related to its use in Kaufman v Zash (supra), i.e., it implies a fraudulent or otherwise improper scheme or conveyance. It indicates that the “tenant” is in fact something other than that which he purports to be. The questioned tenancy has been variously described as an “illusory”, “phantom”, or “fictitious”. (See, e.g., Dworkin v Duncan, 116 Misc 2d 853.)

. The provision now governing subtenancies reads as follows: “Units subject to this *812 law may be sublet * * * provided that (a) the rental charged to the subtenant does not exceed the legal regulated rent plus a ten percent surcharge payable to the tenant if the unit sublet was furnished with the tenant’s furniture; (b) the tenant can establish at all times he has maintained the unit as his primary residence and intends to occupy it as such at the expiration of the sublease * * * (e) where a tenant violates the provisions of subdivision (a) of this section the subtenant shall be entitled to damages of three times the overcharge * * * (f) * * * [t]he provisions of this subdivision (f) shall only apply to subleases commencing on and after July first, nineteen hundred eighty-three.” (L 1983, ch 403, 8 57.)

. It is possible that such landlords could be criminally liable under the Penal Law for the crime of rent gouging, a class B misdemeanor. (Penal Law, § 180.55.)

. The problem of whether a tenancy is legitimate has also arisen in more specialized contexts where courts were required to construe the status of tenant or subtenants seeking the benefit of other regulatory laws. (See, e.g., Dworkin v Duncan, 116 Misc 2d 853 [“residential occupancy” under the Loft Law (Multiple Dwelling Law, § 281 eí seq.; L 1982, ch 349, § 1 eí seg.)]; Matter of Nostra Realty Corp. v Joy, NYLJ, Jan. 16,1981, p 4, col 1 [“primary residence” under rent control]; Payn v Lyras, 91 AD2d 557 [“tenant in occupancy” permitting purchase in cooperative conversion]; see, also, Ian v Wassberg, 80 AD2d 505, affd 55 NY2d 706.)

. The problem has become so acute that apartment seekers in Manhattan, a most sought after place to live, are asked to pay anywhere from $2,000 to $50,000 “under the table”, above and beyond the monthly rent. There are so many people seeking apartments and so few apartments available, subletting for profit has become attractive and *818 widespread, albeit illegal. (See New York Times, July 19, 1984, section B, p 1.)