OPINION OF THE COURT
Martin Schoenfeld, J.
This holdover proceeding commenced by a prime tenant Sirley Bedikoglu Bishar (hereinafter referred to as Bishar) against her subtenants Mr. and Mrs. William Dukas (hereinafter referred to in the singular as Dukas) presents a novel issue in what is becoming a line of first impression cases resulting from the well-intentioned but somewhat vague Loft Law of *653 1982. Under the facts of this case, where the landlord is not a party, who as between Bishar and Dukas is the actual residential occupant having superior rights to that portion of the loft in question?
The premises in issue concern the west half of the fourth floor at 151 Hudson Street in Manhattan. The building itself presently has the status of an interim multiple dwelling within the meaning of New York State Multiple Dwelling Law article 7-C, commonly known as the Loft Law. (L 1982, ch 349.) The pertinent facts of this case are as follows:
THE FACTS
On December 7, 1978 pursuant to a written standard form of loft lease Bishar rented from her landlord the entire fourth floor in this six-story building at an annual rental of $7,800 payable at $650 per month. Sometime in 1980 Bishar divided her area, subletting the eastern portion to Gary Johnson who still resides in that space. At various times since 1980 the western portion has also been sublet by Bishar to different people. On December 17, 1982 a written sublet agreement for the western half of the fourth floor was entered into between Bishar and Dukas. The written agreement was for a period of one year to end December 17, 1983 with the annual rental to be $7,800 payable in equal monthly payments. It was also agreed that Dukas would pay a proportionate share of the utilities for the premises. The sublease had been drafted and entered into with the aid of Henry Witmayer, a real estate broker.
There was never a written extension of the lease. However, at the end of the term Dukas continued to reside at the premises and Bishar continued to accept monthly rent until sometime later in 1984 when Bishar sought to move back into the loft. The refusal by Dukas to vacate the premises resulted in the present holdover proceeding.
At trial Sirley Bishar testified that she originally sublet the apartment to others because of personal problems she was having with her parents. Later, upon renting the space to Dukas, she resided in Canada for over a year where she eventually married a Canadian citizen. It was stated however that she only agreed to a one-year written lease with Dukas because it was her intention to come back and that, together with her husband and their baby, she now wants to live in the loft. Presently, Bishar has been compelled to live in Queens *654 with her parents pending the outcome of this litigation. Further, Bishar testified to having previously painted the loft and to doing work with respect to the walls, bathroom and kitchen sink. It was also noted that the middle of February 1984 was the last time Dukas paid Bishar for either utilities or use and occupancy.
Rosemary Dukas testified to residing at the premises with her husband William and their young son. She stated that the family moved into what was essentially unfurnished raw space. It was noted that Bishar left no personal or other belongings. William Dukas testified that it was only by his hard work and effort that the space became livable. He testified to having built an entire kitchen, to having partitioned the rooms, to painting, fixing floor and ceiling, doing plumbing and electrical work. He stated to having expended the sum of $17,000, mostly for work material, and to having purchased a refrigerator, washer and dryer. Mr. Dukas claims the subject premises to be his only home, and asks that his family be allowed to remain there.
Gary Johnson and Henry Witmayer also appeared at trial. Mr. Johnson testified to living in the eastern portion of the loft since early 1980 for which he pays Bishar $650 per month plus one half of the utilities. It was mentioned that since the time of his tenancy there had been two other couples before Dukas residing in the western portion and that Bishar’s brother also stayed there for a few months. Mr. Witmayer testified that he represented Bishar in the subletting of the eastern portion of the loft to Johnson. He again assisted her later in subletting the western portion to Dukas for which he received a commission paid by both Bishar and Dukas. According to Witmayer, although he was told about her going to Canada, Bishar clearly said that she wanted to only give Dukas a one-year lease.
THE CONTENTIONS
Bishar claims that this holdover proceeding is a simple matter based upon the expiration of a clearly written sublease. She states that since this is not a proceeding between Bishar and her landlord, any question concerning her primary residence is irrelevant. In any event it is further averred that she did reside at the loft and does intend to immediately do so again.
In contrast, Dukas says that this is not a simple situation *655 but is rather a unique case. It is urged that pursuant to certain Loft Board regulations the court should find Dukas to be the "residential occupant” qualifying for possession of the subject premises. In particular it is claimed that the loft in issue is the primary residence of Dukas but not of Bishar and therefore that any right she may have had to recover the premises has been extinguished pursuant to section B.4 of the regulations. Dukas also contends that since Bishar does not presently occupy either the eastern or western portion of the loft she has no standing to bring the instant proceeding. This Dukas claims is in accordance with sections B.5 and C.5 of those same regulations. Furthermore, it is alleged that Bishar turned the leasehold into a profit-making business, rather than using it as her residence, thus creating an illusory tenancy.
THE LAW
Ordinarily, the limits of a subtenant’s rights, including the term of occupancy, are governed by the written provisions of the sublease. (Trachter v Parker 86th Assoc., 115 Misc 2d 271, 275-276 [NY County 1982].) At most, occupation after the lease term expires creates a month-to-month tenancy. (Real Property Law § 232-c; Matter of Lazarus v Flournoy, 28 AD2d 685 [2d Dept 1967].) Does the fact that a loft is involved in the present dispute change these general principals? Apparently under certain circumstances it could, but not in the situation at bar.

The Loft Law and Regulations

Essentially, due to the housing shortage, the Loft Law was enacted as a counterpart to the rent stabilization laws in an effort to legalize for residential use previously designated commercial loft space. (See, Matter of Lower Manhattan Loft Tenants v New York City Loft Bd., 104 AD2d 223 [1st Dept 1984].) A Loft Board was created to aid in its implementation. (Multiple Dwelling Law § 282.) Thereafter, in 1983, pursuant to New York City Charter § 1105, Multiple Dwelling Law article 7-C and the Mayor’s Executive Order No. 66, the New York City Loft Board promulgated certain rules and regulations (hereinafter referred to as the regulations) which relate to the subletting, subdivision and assignment of this type of housing.
Both the Loft Law and the regulations refer to the term *656 "residential occupant”. While not clearly defined, it appears that the term was intended to protect qualified occupants, whether they be prime lessees, subtenants, assignees or otherwise, from eviction by the landlord. However, it does not necessarily follow in every case that in relation to a prime lessee, the subtenants are now entitled to any greater possessory right than that provided for in their sublet agreement.
Generally, to qualify as a "residential occupant” entitled to Loft Law protection the requirements of sections B.2 or B.3 of the regulations must first be met. The latter section, B.3, relates only to prime lessees or their assignees. Section B.2 applies to occupants, other than prime lessees, if they were in possession prior to June 21, 1982. That is the date that the Loft Law became effective.
In contending to have a right superior to that of Bishar, Dukas has misconstrued section B.4 of the regulations. While that section does require a prime lessee to show the subject premises to be her primary residence, any rights lost in failing to do so may only be claimed by either the landlord or by another person who has qualified for protection under sections B.2 or B.3. Thus, for example, section B.4 might be relevant if Bishar sought to recover the eastern portion of the loft from Gary Johnson. That is because Johnson, who still resides there, possessed the space prior to June 21, 1982 and may therefore be deemed a residential occupant entitled to protection. The provisions however do not support a claim by Dukas, who did not move in until mid-December of 1982.
Likewise, Dukas has misconstrued sections B.5 and C.5 of the regulations. These related provisions concern a prime lessee who having subdivided her premises, now seeks to occupy more than one space therein. Keeping in mind a need to help alleviate the housing shortage, a prime lessee who occupies one area may not recover additional space from other occupants unless certain requirements are met. However, this is not the present situation, as Bishar does not seek to regain the entire property, but only to recover the one portion occupied by Dukas. Again the situation might be different if Bishar sought both the eastern, as well as the western portion of the loft. Furthermore, these provisions, like those previously mentioned, only appear to apply as between a prime lessee and either the landlord or a person having qualified for protection.

*657
The Dworkin Case

Although written prior to enactment of the regulations, a most helpful case and one which contains issues closely resembling those in the present situation is Dworkin v Duncan (116 Misc 2d 853 [NY County 1982]). There, respondent Duncan occupied an apartment in an interim multiple dwelling owned, by the MacIntyre Building Corp. In 1976 Ms. Duncan signed what was purported to be a sublease agreement with petitioners Dworkin and Safran. In actuality, however, petitioners were major shareholders and principals of the landlord, were sponsors of a cooperative conversion plan, and together with others had interests in each and every apartment in the building. The lease term with respondent was extended from time to time until June 30, 1982. Petitioners thereafter commenced a holdover proceeding alleging expiration of the lease and requesting possession.
After detailing the history and purpose of the Loft Law, Judge Glen stated in Dworkin (at pp 862-863):
"Under the Loft Law we are not constrained by the word 'tenant’, but are instead given the more elastic term, 'residential occupant’, a term whose intention was clearly to free triers of fact from the strictures of more traditional and stable housing arrangements * * * a number of criteria may be important * * * in determining who is the 'residential occupant’ where a prime/subtenant relationship is alleged. These include:
"(1) Who is actually occupying the loft, and for what term?
"(2) Is that occupancy the primary residence of the person in possession? Of the lessee alleging prime tenancy?
"(3) Has the person alleging prime tenancy ever actually resided in the premises or is s/he only the lessee?
"(4) Is the person alleging prime tenancy the lessee of more than one noncontiguous unit in the building?
"(5) Is the person alleging prime tenancy a principal, employee or agent of the owner so as to raise a presumption of 'illusory’ or 'fictitious’ tenancy?”
In holding for respondent, Judge Glen noted that Ms. Duncan continuously lived at the premises for more than six years since 1976, whereas petitioners never intended to reside there and were never its occupants. In fact, as lessees of many noncontiguous units in the building, as principals of the owner, and as sponsors of a co-op conversion plan, Messrs. *658 Dworkin and Safran merely acted as the landlord’s alter ego in what obviously was an "illusory” tenancy.
Applying the same criteria used in Dworkin (supra) to the present situation, the two cases become readily distinguishable. First and foremost, unlike Dukas, it appears that as an occupant since 1976 Ms. Duncan would be considered a person qualified for protection under the loft regulations. Second, whereas Ms. Duncan was permitted to remain for more than six years, Bishar sought repossession of the premises within a few months after expiration of the one-year sublet agreement. Further, although she eventually subdivided it, Bishar actually did reside in the loft.
As for "illusory” tenancy, there is no relationship between Bishar and the owner of the building other than that of landlord and tenant. Clearly Bishar is neither a principal, employee, or agent of the owner. Nor has it been satisfactorily proven that she sublet space solely for the purpose of conducting a business venture, never having the intention of returning there. Further, there has been no testimony that Bishar ever acquired an interest in any other noncontiguous unit in this building or elsewhere.

Use and Occupancy

It should not be overlooked that by charging Dukas and Johnson a monthly rental fee of $650 each, Bishar did collect twice the amount of rent that she was initially paying to the landlord. Nevertheless, pursuant to section 4.b (vi) of the regulations, it appears that a loft sublease entered into before August of 1983 was not subject to rental charge limitations. That is the date the regulations were enacted. Of course, once the original lease between Bishar and Dukas expired on December 17, 1983 it seems only reasonable to expect that the regulations would apply. (See, Matter of Lower Manhattan Loft Tenants v New York City Loft Bd., 104 AD2d 223 [1st Dept 1984], supra.) The court will look to such regulations in deciding what is reasonable compensation for use and occupancy.
While use and occupancy is not specifically covered therein, a reading of section 6 of the regulations pertaining to rent, together with the provisions of other related rent stabilization laws such as Administrative Code of the City of New York § YY51-6.0 (c) (12) serves as a useful guideline in determining the maximum amount which should be paid. Based upon these provisions the court finds that reasonable compensation for use and occupancy of the alleged unfurnished *659 western portion of the premises should be no more than half of the permissible rent being charged by the landlord to Bishar for the entire loft.
Although it does appear that in 1984 there had been a substantial increase in the rent payable by Bishar to her landlord, the amount has not been clearly stated to the court. It is, however, clear that the last rental payment by Dukas having been made on February 15, 1984, there was 10 months’ use and occupancy owed to Bishar at the time trial commenced. An additional five months’ rent has now become due, and the court will deem the petition amended accordingly. There is also outstanding 15 months of utility bills. At trial it was agreed that the monthly utility charge would be $50. Thus, in addition to use and occupancy there is owed $750 for utilities.
CONCLUSION
There being such a grave housing shortage, the providing of housing for one family which necessitates the displacement of another is never an easy decision to make. Nevertheless, the subtenants chose, at their own risk, to invest in the premises and holdover despite being advised of Bishar’s intention to return home. (See, Wemple v Zarember, NYLJ, Mar. 2, 1982, p 6, col 1 [App Term, 1st Dept].) Further there has been no evidence that Dukas ever sought permission to make any of the alleged improvements to the premises. Therefore, based upon the facts and the law, a judgment for possession is hereby granted to Bishar. However, the court in its discretion, and following RPAPL 753 (1), will stay execution of a warrant until July 31, 1985 provided that upon service of a notice of entry of the judgment to be settled herein, Dukas pays to Bishar one month’s compensation for use and occupancy, the amount to be determined at the time of settlement.
A money judgment for the past 15 months’ use and occupancy is granted conditional upon submission of proof as to the rental being charged by the landlord to Bishar during that period. Such proof is to be presented with the proposed judgment to be settled herein. A money judgment of $750 for utilities is granted. All items purchased by the subtenants such as the refrigerator, washer, dryer and any fixtures installed by them which can be reasonably taken without seriously damaging the loft space may be removed by Dukas.
The facts and circumstances of this case are such that it *660 would be unfair and unwarranted to require either side to pay for the other’s legal fees. The application by petitioner and that of respondents for such awards are therefore denied.