OPINION OF THE COURT
David B. Saxe, J.
These motions arise out of a dispute over loft coverage and qualification for protection under the recently enacted Loft Law (Multiple Dwelling Law, art 7-C, § 280 et seq.). A decision was rendered by the Loft Board on June 5, 1985. By motion No. 156, petitioners, who were occupants of the subject premises, challenge that decision by way of a CPLR article 78 proceeding. Briefly stated, the Loft Board granted coverage to petitioners Korn and Banks, but only as to unit A of the *197 fourth floor of 88 University Place. However, it denied coverage to petitioners Nason and Hightower of unit B and petitioner Ballentine and Koff of unit C.
In motion No. 155, respondent 88 University Place seeks an order, pendente lite, enjoining petitioners Korn and Banks from rerenting or occupying unit B (and by reply affidavit includes the recently vacated unit C as well). There is a temporary restraining order currently in effect, granting that relief, by Justice Leonard Cohen, dated October 18,1985.
However, in motion No. 157, petitioners seek an order holding 88 University Place in contempt of that temporary restraining order because it allegedly attempted to change the locks on unit B and disrupt the status quo.
By way of background the following are the pertinent facts:
On April 22, 1977, landlord of 88 University Place, Varsity Properties, Inc. and petitioners Korn and Kahn entered into a loft lease for the fourth floor of the subject premises. The lease was to terminate on April 30, 1982. Although there is no indication in the lease, petitioners Korn and Kahn maintained that, at all times, the fourth floor had been divided into three separate units. From the time Korn and Kahn moved in and through the lease period they were subletting the other two units to various tenants. Paragraph 11 of the lease stated that subletting was permitted subject to the landlord’s consent. During the lease term the landlord never contested the subletting of the other units, in spite of there being testimony that written consent was never formally obtained. In fact it appears that initially Korn and Kahn resided together in unit C but that in May 1979 Korn moved into unit A with Banks, and Kahn remained in unit C until the lease expired. When the lease expired in May 1982 Korn and Banks were living in unit A and two new residents took occupancy in units B and C.
Shortly after the lease expired, the Loft Law became effective. Then, the new net lessee, respondent 88 University Place, commenced a holdover eviction proceeding against Korn/Banks in the Civil Court (88 Univ. Place Assoc. v Korn, Landlord & Tenant No. 119659/82). Petitioners Korn and Banks maintained that they were protected under the new Loft Law. It appears that while Korn and Banks’ status under the Loft Law was still unclear and while the eviction proceeding was still pending, they sublet the other two units to petitioners Nason and Hightower in unit B and petitioner *198 Ballentine in unit C. They took occupancy on January 1, 1983 pursuant to oral lease agreements.
On September 23, 1983, Judge Kristin Booth Glen determined that during the critical window period, three separate families were residing in three units on the fourth floor of these premises. Judge Glen did not touch on the issue of who was qualified for protection, but only that the units themselves came under the Loft Law definition of interim multiple dwelling (Multiple Dwelling Law § 281 [1], [2]). In fact, Judge Glen refused to consider the validity of any subtenancy on the issue of interim multiple dwelling status. Accordingly, the holdover petition was dismissed for the reason that the landlord had failed to register the building with the Loft Board. The parties were directed to take their respective courses of action. And so they did.
On October 17, 1983 petitioners filed a coverage application requesting protection of their respective units. In its answer respondent contended that the occupants of units B and C were not protected under article 7-C because they went into occupancy on January 1, 1983, pursuant to illegal and unconsented subleases with Korn. Respondent objected to Korn’s coverage of unit A because of his purported illegal subletting activities in violation of Real Property Law § 226-b, the expired lease and the Loft Board’s own regulations.
In November 1983 respondent brought another holdover proceeding in the Civil Court (index No. 100964/83) for substantial violation of their tenancy and nonpayment of rent.
On April 22, 1984 Judge Jacqueline Silberman stayed the Civil Court proceeding, directed payment by Korn and Banks of use and occupancy and referred to the then pending Loft Board proceeding the issue as to whether Korn "could recover units in the subject-leasehold which were allegedly illegally sublet”.
In order No. 252 the Loft Board decided that the occupants of units B and C, who came into residency after January 1, 1983 without the landlord’s consent, were not protected under the Loft Law. Petitioner Banks and Korn were entitled to protection solely as to unit A. However, the Loft Board could not determine the issue of whether Korn-Banks were entitled to possession of these units because that is within the jurisdiction of the Civil Court. It only resolved the issue of coverage and application of the Loft Law.
In this application, petitioners argue that Judge Glen had *199 previously ruled that there were three units protected under the Loft Law and that these units could be sublet by Korn. Petitioners assert that in ruling as it did, the Loft Board overruled Judge Glen’s decision because in effect it decided that Korn breached the lease by subletting two of the three units demised to him.
The Loft Board’s order did not overrule Judge Glen’s decision. As stated above, all that Judge Glen decided was that the fourth floor consisted of three separate residential units which were to be entitled to Loft Law protection and treated as residential units. If petitioner in any way inferred from Judge Glen’s decision that he was entitled to sublet those units, and also entitled to recover them, he is incorrect. That decision was designed to treat what was formally leased as one unit as three separate units. Had Judge Glen determined that Korn and Banks resided in the entire floor then petitioners would not have been protected at all. Without a finding of three or more residential units during the window time period, there can be no Loft Law protection. (Multiple Dwelling Law § 281 [1].)
Moreover, the claim that the Loft Board exceeded its jurisdiction is also incorrect. The Loft Board is specifically charged with determining interim multiple dwelling status and other issues of coverage pursuant to this article (Multiple Dwelling Law § 282). Courts will defer to the construction given statutes and regulations by the agencies responsible for administration so long as such construction has a rational basis (Matter of Bernstein v Toia, 43 NY2d 437 [1977]).
The Loft Board found that occupants of units B and C were not protected because under either the expired lease, Real Property Law § 226-b, or its own rules and regulations, sections B-3 and C-4, there can be no subletting or subdividing without first obtaining the landlord’s consent. During the hearing, there was testimony that Korn obtained oral consent from respondent’s employee. However, it was denied by respondent and rejected by the Loft Board.
The opposing opinion of Loft Board member Chuck Delaney raised the point that these laws were not in effect on January 1, 1983 and therefore should not apply adversely to petitioners. At first that argument sounds reasonable. However, it is unpersuasive. Mr. Delaney states that the critical time period here is after the Loft Law became effective but before interim multiple dwelling status was formally determined. However, *200 the entire thrust of the Loft Law was to protect those tenants who had been living in precarious living arrangements before the Loft Law went into effect. It was not designed to encourage people to create new ones.
Although the Loft Board’s own regulations concerning subletting/subdividing were not promulgated until August 1983, the Loft Law became effective in June 1982 before petitioners took occupancy in units B and C. The Loft Law was designed to protect all residential occupants whether or not they are in privity of contract with the landlord. (Dworkin v Duncan, 116 Misc 2d 853 [Civ Ct, NY County 1982].) However, the cutoff period for protection of those not in privity, and living without the landlord’s consent, was June 1982. After that time, the subtenants were to have obtained written consent. The reason for this was to enable those who had entered into commercial leases and who had expended time, energy and money in converting the space for residential use, the opportunity to be protected as residential tenants and to enable the landlord to pass on the costs of such conversion and to bring summary proceedings. (Dworkin v Duncan, supra). The law recognized the realities of this situation and served a remedial purpose. It therefore put formalities aside.
However, after June 1982 it tightened up those regulations so as to align its regulations with the Real Property Law. Petitioners, who took occupancy in January 1983 were not, as were the subtenants in Dworkin v Duncan (supra), invested in their lofts. In fact, these occupants had little investment, financial or otherwise, which investment the Loft Law was designed to protect.
Moreover, as was pointed out by the concurring opinion of Loft Board member Rafael Martinez, those subtenants moved in on January 1, 1983 without even obtaining any written lease from Korn/Banks. On that day Korn/Banks were merely holdover tenants and were awaiting Loft Law protection. It was speculative at best for any of these parties to enter into a new tenancy on the basis of such a precarious status.
However, the Loft Board did find that Korn and Banks, occupants of unit A since 1979, qualified for protection under the Loft Law. Although under the expired lease Korn/Kahn had the right to reside in the entire fourth floor, it is undisputed that they lived solely in one of the three units. After the lease term ended they sought to be protected as residen *201 tial tenants of the entire floor. The Loft Law was enacted to create a conditional amnesty for owners and tenants who had violated the law in the past and to prevent future abuses. What the Loft Board did was to permit subtenant occupants who had moved in illegally (failure to comply with Real Property Law § 226-b among other things) prior to the corrective date of the Loft Law to remain. (Matter of Association of Commercial Prop. Owners v New York City Loft Bd., 128 Misc 2d 370.)
The corrective date is June 21, 1982. Petitioners Bank and Korn were aware of the enactment of the Loft Law, inasmuch as they stayed in their loft after the lease expired based on the claim that they were protected under that law. A reading of that law expressly provides that residential occupants are afforded the protections available to residential tenants pursuant to the Real Property Law (Multiple Dwelling Law § 286 [11]). Thus, the law put tenants and landlords on notice that if coverage was obtained they would be guided under the principles which govern other residential tenants. For Banks/Kahn to argue that they should have been permitted to rent those units without obtaining the landlord’s consent would be tantamount to selective application of the law as it best suits them. And it would totally ignore the right of a landlord, or in this case a net lessee, to know who resides in the premises which they own and are ultimately legally responsible to maintain.
In reviewing respondents’ order the court is mindful that while the powers of an administrative agency are not unlimited, "courts will defer to the construction given statutes and regulations by the agencies responsible for their administration, if said construction is not irrational or unreasonable” (Matter of Albano v Kirby, 36 NY2d 526, 532 [1975]; Matter of Lower Manhattan Loft Tenants v New York City Loft Bd., 104 AD2d 223 [1st Dept 1984], affd 66 NY2d 298).
In the instant proceeding the Loft Board interpreted the applicable law to the pertinent facts and fashioned a decision which was reasonable and fair. That decision should not be disturbed.
MOTION FOR INJUNCTIVE RELIEF
Respondents seek an order preventing Korn and Banks from occupying units B and C during the pendency of this action. However, by upholding the Loft Board’s decision, the underlying action is dissolved. Petitioners Banks and Korn are *202 entitled to reside as protected Loft Law tenants only in unit A.
Accordingly, there is no basis for granting pendente lite relief and that motion is therefore denied.
MOTION FOR AN ORDER OF CONTEMPT
Here, petitioners contend that agents of 88 University Place violated the temporary restraining order of October 17, 1985. That order prohibited Banks and Korn from occupying or subletting unit B. Petitioners now contend that 88 University Place has tried to change the locks on unit B. Respondent contends that the order was directed to restrain Korn and Banks’ activities, not theirs, and they have only tried to secure the other presumably vacant units.
It appears that by stipulation of November 7, 1985 the parties themselves have agreed to an orderly arrangement so that petitioners do not feel threatened and the respondents feel secure. There is no basis to find that respondents have willfully failed to obey an order which is in any event not literally directed to restrain their activities (CPLR 5104).
The parties are advised to adhere to terms of their own stipulations. The stay of the Civil Court action is now lifted and the parties are directed to proceed there to seek the remaining relief.
In accordance with the above, the petition is dismissed and the motions for injunctive relief and an order of contempt are denied.