*48 OPINION OF THE COURT
Simons, J.
The Attorney-General commenced this action, pursuant to article 23-A of the General Business Law (Martin Act, General Business Law §§ 352 — 359-h), alleging that defendants Louise Dembeck, Giora Neeman and Badem Buildings had engaged in a fraudulent scheme to consummate an eviction-type cooperative conversion plan by executing leases with non-bona fide, illusory tenants and by declaring the plan effective on the basis of subscription agreements executed by these tenants, in violation of General Business Law § 352-c (1) (a). By doing so, the Attorney-General alleged, defendants withheld the plan from various subtenants, which he deemed the bona fide tenants in occupancy, thereby depriving them of the opportunity to purchase the apartments. He also alleged that the defendants’ declaration of effectiveness contained material false statements and failed to include pertinent information concerning the plan.
Supreme Court, after a nonjury trial, determined that defendants had committed a fraudulent practice in violation of the Martin Act by reserving a portion of their building for persons whom they reasonably believed would not occupy the units or would occupy them only for a brief period, conscious of the fact that such tenants, having only the investment potential of the apartment in mind, would be more likely to subscribe to the conversion plan than would occupying tenants. Although it held against defendants, the court expressly found that they had neither solicited tenants who would sublet rather than occupy their respective apartments nor induced the tenants to execute subscription agreements.
The Appellate Division modified by setting aside the Martin Act violation. The court stated that, although a number of the prime tenancies could be considered illusory and that finding could support denial of the conversion plan, "their existence as such did not show 'persistent fraud’ or a pattern of fraud” warranting civil sanctions under the Martin Act (120 AD2d 372, 373).
*49 We granted leave to appeal and now affirm. In view of Supreme Court’s express finding that there was no collusion between the landlords and the prime tenants of record, we hold that renting units in an apartment building to persons whom the landlord may have reasonably believed would not occupy the units or would occupy them only briefly, even if the landlord is aware that tenanting the building with such prime tenants will facilitate a cooperative conversion, cannot, by itself, be a fraudulent or deceptive practice sufficient to support a civil prosecution under the Martin Act. Absent evidence of such collusive activity, the mere presence of what may be "illusory tenancies” in a building slated for cooperative conversion is an insufficient basis upon which to impose Martin Act penalties.
I
Badem Buildings is a partnership composed of Louise Dem-beck and Frederick and Helene Baum. In September 1979, the partnership purchased a 30-unit residential building located at 469 West 57th Street in Manhattan which has been managed by Dembeck and her husband, Giora Neeman. Of the 30 units in the building, 28 were residential and, upon purchase, Badem commenced renting the apartments as they became available.
In May 1980, Badem submitted to the Attorney-General a proposed offering plan for the conversion of the building to cooperative ownership. At the time the offering was accepted for filing by the Attorney-General, in December 1981, the law then in effect required that, for an eviction-type offering plan to be declared effective, 35% of the tenants in occupancy on the date the plan is accepted for filing by the Attorney-General must have agreed to purchase the stock entitling them to proprietary leases for such dwelling units without discriminatory repurchase agreement or other discriminatory inducement (see, Administrative Code of City of New York former § YY51-6.0 [c] [9] [a] [Rent Stabilization Law], amended by L 1982, ch 555 [now § 26-511 (c) (9-a)]; General Business Law former § 352-eeee [1] [b]; [7] [i], repealed by L 1982, ch 555).[1] In computing the 35% requirement, purchases by tenants of *50 record of subleased apartments could be included, but subtenants had no right to purchase unless approved by the tenant of record (Code of Rent Stabilization Association of New York City, Inc. § 61 [4] [a] [v] [Rent Stabilization Code], adopted pursuant to Administrative Code § YY51-6.0 [b] [now § 26-511 mi
Badem presented its first offering plan in January 1982 but the plan failed to receive the requisite 35% subscription, largely because of opposition to it by the tenants’ association. In September 1982, the Attorney-General accepted for filing a second amendment to the original plan, which included various modifications designed to encourage subscription. Thereafter, in November 1982, Badem filed a third amendment to the plan declaring that the 35% subscription level had been met. The amendment was accompanied by the affidavit of Louise Dembeck which, among other things, listed the names of the 12 subscribers who had purchased prior to service upon the tenants of the notice declaring the plan effective and who were counted toward the requisite 35% minimum. These 12 subscribers, who are central to the present dispute, were either social or business acquaintances of one or more of the principals. In December 1982, the Attorney-General rejected the third amendment asserting that it appeared to contain misrepresentations falsely indicating compliance with section 61 of the Rent Stabilization Code because it stated that all subscribers included in the sponsor’s calculations were bona fide tenants, because it failed to disclose that five Conciliation and Appeals Board (CAB) complaints had been filed by the subtenants occupying the apartments claiming that they were the true tenants and because it falsely stated that all tenants in occupancy were accorded the exclusive right to buy, as required by section 61. The latter allegation was based upon the Attorney-General’s position that some or all of the subtenants who had instituted proceedings with the CAB would establish their right to be treated as prime tenants, and that *51 if they did, the sponsor would not have complied with section 61 by virtue of having failed to offer them the exclusive right to buy.
In April 1983, Badem brought an article 78 proceeding seeking to compel the Attorney-General to accept the third amendment. The petition was granted to the extent of directing the Attorney-General to issue a more complete and detailed deficiency letter. In response, in October 1983, the Attorney-General issued a second deficiency letter, expanding upon the first letter and, among other things, detailing why the prime leases to the 12 individuals were illusory. He accused Badem of improperly relying upon subscriptions from nine of these illusory prime tenants and charged that Badem had not complied with the Rent Stabilization Law and the Rent Stabilization Code because it failed to serve the plan on nominal subtenants who, according to the Attorney-General, were the bona fide tenants entitled to purchase. In the same month, the Attorney-General commenced the present action alleging that defendants Badem, Dembeck, Neeman and the Baums had engaged in various fraudulent practices with regard to the conversion plan in violation of the Martin Act and Executive Law § 63 (12). In essence, the Attorney-General asserted that defendants had made representations in the third amendment and the affidavit which they knew or should have known were false and deceptive, that defendants failed to disclose either that the 35% requirement was met by including subscriptions from illusory prime tenants who were not bona fide tenants in occupancy on the date the plan was accepted for filing or that CAB complaints had been filed, and that defendants had otherwise engaged in fraudulent or deceptive conduct in violation of the Martin Act and Executive Law § 63 (12). In February 1984, Badem brought another article 78 proceeding to compel acceptance of the third amendment. The court subsequently consolidated the two article 78 proceedings, but summary relief was denied to both parties on the ground that issues of fact existed with respect to the questions of fraud and illusory tenancies. Thereafter, the article 78 proceedings and the Attorney-General’s fraud action were consolidated for trial in Supreme Court.
After trial, the court found that some prime tenants who had either a direct or indirect relationship to one or more of the principals had sublet their apartments without ever taking occupancy, that they had sublet to subtenants who had, in most cases, been found by the landlord, paid rent and security *52 deposits directly to the landlord, signed subleases prepared by the landlord, and had "expectations of receiving a prime lease.” The interaction between the landlord and the prime tenant and between the landlord and the subtenant was such, the court noted, that the prime tenant, knowing that the owners were considering a cooperative conversion, could and did freely speculate without any significant risk. Although the court found that the landlords neither sought out tenants who would sublet rather than occupy their apartments nor exacted any promise from potential tenants to execute subscription agreements, it accepted the Attorney-General’s contention that a fraud occurred when the landlord acted upon its self-interested desire to tenant its building with those who would sublease, with a view toward facilitating a cooperative conversion. Accordingly, it determined that defendants Badem Buildings, Dembeck and Neeman had engaged in fraudulent behavior in violation of the Martin Act. It did not pass on the allegations of misrepresentation and, in view of its findings of the Martin Act violation, it dismissed Badem’s article 78 proceedings. The court found that Frederick and Helene Baum did not know or have reason to know of the details of the tenancies and therefore dismissed the complaint against them. The court permanently enjoined defendants from engaging or attempting to engage in the public offer or sale of securities, including cooperative interests in realty, within or from New York State but it did not assess a civil fine against them.
On appeal by Badem, Dembeck and Neeman, the Appellate Division modified, on the law and the facts, to the extent of reversing the finding of a Martin Act violation, and otherwise affirmed.
II
The rent stabilization laws were enacted to meet a serious housing shortage and to protect those who are able to afford only reasonable rents. To this end, the New York City Administrative Code provides that it should be applied "to prevent exactions of unjust, unreasonable and oppressive rents and rental agreements and to forestall profiteering, speculation and other disruptive practices” (Administrative Code § YY511.0 [now § 26-501]). An illusory tenancy is defined generally as a residential leasehold created in a person who does not occupy the premises for his or her own residential use and *53 subleases it for profit, not because of necessity or other legally cognizable reason (see, Hutchins v Conciliation & Appeals Bd., 125 Misc 2d 809, 811; see also, Matter of Avon Furniture Leasing v Popolizio, 116 AD2d 280, 284). Such tenancies are condemned because they permit the unscrupulous to use the provisions of the rent stabilization laws for financial gain, at the expense of those entitled to the laws’ protections to obtain living quarters at reasonable cost, and thereby frustrate the laws’ purposes. Thus, both the courts and the administrative agencies charged with overseeing rent stabilization have readily formulated remedies to prevent the use of illusory tenancies to evade the provisions of the Rent Stabilization Code and to prevent illusory tenants from violating the rights of bona fide tenants occupying stabilized property (see, e.g., Matter of Perlbinder v New York City Conciliation & Appeals Bd., 67 NY2d 697; Matter of Avon Furniture Leasing v Popolizio, supra; Yellon v Reiner-Kaiser Assocs., 89 AD2d 561).
The State maintains that in this case the 12 questioned tenancies in defendants’ building are illusory, that by entering into these leases defendants have denied the subtenants the right to purchase and have enabled social and business acquaintances to use the law to profit undeservedly from the protection afforded rent-stabilized tenants during cooperative conversions. It contends that the magnitude of this situation is sufficient to show that defendants created the tenancies to aid in converting the property by counting subscription agreements from these illusory tenants toward the effectiveness of the conversion plan and that this is precisely the type of fraudulent and deceitful conduct prohibited by the Martin Act. Implicit in the State’s argument is the notion that violations of the Rent Stabilization Code, which this may well be, also constitute Martin Act fraud.
ra
Section 352-c (1) (a) of the General Business Law prohibits the use of fraud, deception or concealment to induce or promote the sale or exchange of securities in this State.[2] The *54 statute was enacted to protect the public from fraudulent exploitation in the offer and sale of securities, and its provisions are to be liberally construed to give full effect to its remedial purpose (All Seasons Resorts v Abrams, 68 NY2d 81, 86-87; Matter of First Energy Leasing Corp. v Attorney-General of State of N. Y., 68 NY2d 59, 64; People v Lexington Sixty-First Assocs., 38 NY2d 588, 595; People v Federated Radio Corp., 244 NY 33, 37, 38). Thus, in People v Federated Radio Corp. (supra), we gave the words "fraud” and "fraudulent practice” a wide meaning and we stated that "fraud” in a broad sense includes "all deceitful practices contrary to the plain rules of common honesty” (id., at 38, 39). In that case, we held that the statute was broad enough to encompass "equitable fraud” for which "scienter” is not needed and that scienter, therefore, need not be alleged and proved in order to sustain Martin Act liability (see, id., at 40-41). Subsequently, in People v Lexington Sixty-First Assocs. (supra), we applied the Martin Act to sponsors of cooperative and condominium ventures, who had engaged in a profit-sharing scheme with illusory prime tenants.
Notwithstanding the breadth of these rules, we agree with defendants that their conduct is not conduct which rises to the level of a fraudulent or deceitful practice under section 352-c (1) (a) as it has been interpreted. Renting to persons of a certain economic category — whom defendants did not solicit or induce to subscribe to a conversion plan as a condition to either renting or subletting — and offering the right to purchase to (and counting as subscribers) those tenants to whom defendants were legally obligated and permitted to is not conduct proscribed by the Martin Act.[3]
The trial court’s finding of fraud was based upon its conclu *55 sions (1) that defendants were “conscious” of the “fact” that nonresident tenants were more likely to subscribe to the conversion plan than were resident tenants and (2) that, with knowledge of this fact, and acting in their own self-interest, defendants elected to lease to nonresident tenants. None of these conclusions is supported by evidence in the record but, even assuming the correctness and logic of the court’s determinations of the propensities of nonresident, nonoccupying tenants and defendants’ alleged understanding and/or exploitation of such propensities, it simply is not fraudulent or deceitful for a landlord to rent to a prospective tenant based solely on the landlord’s economic self-interest in the hope that these tenants will, when the time comes, act in a manner consistent with the landlord’s interests.
The Attorney-General argues that because the landlord discovered some of the subtenants and managed the leases and rents for the prime tenants there is sufficient circumstantial evidence to support an inference of a common scheme or plan between the landlord and the prime tenants to effectuate the conversion for their profit and at the expense of the rights of the tenants in residence. The short answer to that argument is that the court did not draw any such inference: it expressly found otherwise.- Moreover, the evidence in the record establishes why the court could not draw any inference of collusion or concerted action. The record reveals that two apartments were vacant when defendants acquired the building and that these and other apartments were leased to friends and business acquaintances who had inquired only as apartments became available. There is no evidence that defendants forced resident tenants out of units so that they could facilitate a cooperative conversion, or that rentals to the prime tenants were conditioned on the tenant not occupying the apartment or on agreeing to subscribe to a conversion plan, or that defendants expressed any desire not to rent to a prospective tenant if he or she wanted to occupy the apartment. Indeed, it appears that some of the prime tenants involved here, rather than acting in concert with the landlord, were members of a tenants’ organization which opposed the first offering plan and overwhelmingly declined to subscribe to it. As a result, defendants had to amend the plan to offer the tenants better terms and conditions to encourage subscription and, even after it did so, one of the suspect prime tenants decided not to subscribe.
Fraudulent or deceitful conduct cannot be imputed to defen *56 dants simply because prime tenants, acting in their own self-interest, rent and hold on to their apartments for possible future financial gain. Although the participation of illusory tenants may prevent the adoption of a conversion plan, it does not necessarily warrant the conclusion that the landlords have committed fraud under the Martin Act. These defendants, unlike those in similar cases the people rely on, did not solicit any prospective tenants to rent with the intent to influence the voting, or enter into any agreement whereby defendants secured promises to subscribe in return for permitting the prime tenant to sublet, or enter into any agreement whereby the leasing and ultimate purchase of the apartment were tied to a resale profit-sharing arrangement intended to encourage subscriptions (see, People v Lexington Sixty-First Assocs., 38 NY2d 588, supra). Nor did defendants employ a "strawman”, acting as the landlord’s agent or in cooperation with the landlord, to help the landlord control the voting on the plan (see, Hutchins v Conciliation & Appeals Bd., 125 Misc 2d 809, 813, supra [citing Stutt v Unique Restorations Co., 96 AD2d 1039; and Yellon v Reiner-Kaiser Assocs., 89 AD2d 561, supra]). Absent similar evidence indicating collusion, coercion or discriminatory inducement, the mere presence of a number of illusory tenancies cannot support a determination that defendants engaged in fraudulent or deceitful conduct in violation of the Martin Act.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Wachtler and Judges Kaye, Alexander, Ti-tone, Hancock, Jr., and Bellacosa concur.
Order affirmed, with costs.

. General Business Law § 352-eeee (2) (d) (i) (as added by L 1982, ch 555) currently provides that an eviction plan "may not be declared effective unless at least fifty-one percent of the bona fide tenants in occupancy of all dwelling units in the building * * * on the date the offering statement * * * *50 was accepted for filing by the attorney general * * * shall have executed and delivered written agreements to purchase under the plan pursuant to an offering made in good faith without fraud and with no discriminatory repurchase agreements or other discriminatory inducements.” Chapter 555 of the Laws of 1982 states that a "plan accepted for filing by the department of law on or before the effective date of this act [July 20, 1982] shall continue to be governed by the provisions of section three hundred fifty-twoeeee of the general business law as they had existed immediately prior to the effective date of this act.”

. General Business Law § 352-c (1) (a), (c) provides, as follows:
"1. It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to use or employ any of the following acts or practices:
"(a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale; * ** *
"where engaged in to induce or promote the issuance, distribution, ex *54 change, sale, negotiation or purchase within or from this state of any securities or commodities, as defined in section three hundred fifty-two of this article, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.”

. None of the prime tenancies involved here had previously been determined to be illusory in a CAB proceeding (see, e.g., Matter of Perlbinder v New York City Conciliation & Appeals Bd., 67 NY2d 697; Hutchins v Conciliation & Appeals Bd., 125 Misc 2d 809), an eviction proceeding (see, e.g., Tirschwell & Co. v Chiari, NYLJ, Nov. 23, 1983, at 11, col 1 [App Term]), or a declaratory judgment action (see, e.g., Yellon v Reiner-Kaiser Assocs., 89 AD2d 561; cf., Stutt v Unique Restorations Co., 96 AD2d 1039), which would have entitled the nominal subtenants to be accorded the full rights of a prime tenant under the Rent Stabilization Code.