(September 10, 1987)

■ STATE OF NEW YORK, Respondent, v MARTIN FINE et al., Appellants.—Order of the Supreme Court, New York County (Andrew R. Tyler, J.), entered on November 19, 1986, which, *inter alia,* granted plaintiff's motion for a preliminary injunction enjoining defendants, their agents and employees, pending the hearing and determination of the subject action, from engaging in or attempting to engage in any business relating to the purchase and sale of securities to the public within or from the State of New York, is affirmed, without costs or disbursements.

As the Court of Appeals held in *People v Lexington Sixty-First Assocs.* (38 NY2d 588, 595), in reference to the Martin Act: "Article 23-A of the General Business Law is remedial in nature and should be liberally construed in order that its beneficent purpose may, so far as possible, be attained * * * More to the point, in reviewing condominium and co-operative apartment ventures, the most rigid standards of fair dealing and good faith toward tenants are to be imposed on promoters" *(see also, Matter of Badem Bldgs. v Abrams,* 70 NY2d 45; *All Seasons Resorts v Abrams,* 68 NY2d 81). In *Matter of Badem Bldgs. v Abrams (supra,* at 53-54), the Court of Appeals recently reiterated this principle when it declared that the Martin Act: "prohibits the use of fraud, deception or concealment to induce or promote the sale or exchange of securities in this State. The statute was enacted to protect the public from fraudulent exploitation in the offer and sale of securities, and its provisions are to be liberally construed to give full effect to its remedial purpose *(All Seasons Resorts v Abrams,* 68 NY2d 81, 86-87; *Matter of First Energy Leasing Corp. v Attorney-General of State of N.Y.,* 68 NY2d 59, 64; *People v Lexington Sixty-First Assocs.,* 38 NY2d 588, 595; *People v Federated Radio Corp.,* 244 NY 33, 37, 38). Thus, in *People v Federated Radio Corp.* (supra), we gave the words 'fraud' and 'fraudulent practice' a wide meaning and we stated that 'fraud' in a broad sense includes 'all deceitful practices contrary to the plain rules of common honesty' *(id.,* at 38, 39). In that case, we held that the statute was broad enough to encompass 'equitable fraud' for which 'scienter' is not needed

and that scienter, therefore, need not be alleged and proved in order to sustain Martin Act liability *(see, id.,* at 40-41)."

In carrying out the remedial intent of the Martin Act to protect the public interest and prevent substantial and possibly irreparable harm, the Attorney-General possesses broad enforcement powers, including the authority to seek both temporary and permanent injunctive relief. For purposes of injunctive relief pursuant to the Martin Act, we agree with the statement of Justice Richard Wallach in *People v Glenn Realty Corp.* (106 Misc 2d 46, 47), that since the statute is remedial in nature, the Attorney-General "need only show prima facie that the respondents' actions fell within the purview of the act and that, as such, they violated the act".

It should be noted, however, that even applying the higher standard for injunctive relief under CPLR article 63, the Attorney-General has, in the instant matter, made a sufficient factual showing to warrant the drastic remedy of a preliminary injunction. In that regard, an examination of the record herein, as well as the offering plans of the cooperative conversions in question, reveals that plaintiff has adequately demonstrated its allegation that with respect to both properties, 565 Broadway and 684 Broadway, important details have been selectively omitted from the prospectuses. Consequently, there is no indication in either case that the mortgaging arrangement is such that it is in the sponsor's interest for a default to occur.

For example, the first amendment to the offering plan relating to 565 Broadway neglects to mention that the first mortgage held by OD Investors, having an outstanding balance of $240,000, which is to be assumed by the cooperative corporation, provides for the payment of interest only. According to the plan, this mortgage requires monthly payments of $3,600, including interest at 7% per annum. The monthly installments must then be applied by the holder to payments of principal and interest on the prior mortgages (the details of which are nowhere mentioned). The Attorney-General states in his affidavit that under this mortgage "$40,000 of the $240,000 had not yet been advanced as of the signing of the mortgage agreement dated October 31, 1978 but was to be advanced in accordance with the agreement. The agreement provided for interest to be paid on the principal sum of $240,000 at 14½% per annum. The agreement did not provide for the payment of principal." However, the impression given by the prospectus is that the $3,600 monthly payments, including interest at 7% per annum, would be used to pay both

interest and principal. The purchasers were not advised that the corporation's monthly payments would be applied to interest only and that if they wished to pay principal, the rate on the latter would, according to the Attorney-General, be at 14½%.

The second mortgage on the 565 Broadway property, the first mortgage being subject and subordinate thereto, is described in the prospectus as having a principal balance of $119,248 held by 39-41 Worth Street Co., payable semiannually up to June 30, 1979 at a rate of 7% per annum, interest only; and thereafter up to July 1, 1982 at a rate of 8% interest plus 1% amortization, followed by a rate of 8% interest and 2% amortization to be paid to July 1, 1989, when the entire principal sum shall be due and payable. At that time, the aggregate unpaid principal would be $89,928.

By the time of the closing, the property was encumbered by a single 12-year wraparound mortgage in the amount of $420,000 at 7% annual interest with payments by the cooperative to be $3,600 per month, including interest. This wraparound mortgage would presumably be subordinate to both the OD Investors mortgage and the Worth Street mortgage and would require that the monthly installments be applied to payments of principal and interest on the prior mortgages. Again, nowhere was it disclosed that there was no provision for amortization of the OD Investors mortgage or that there would be a shortfall at the expiration of the mortgage.

As to the premises at 684 Broadway, although there were certain significant details left undisclosed, such as the identity of the holder of the senior wraparound mortgage and the terms of payment and interest rate pertaining to two of the mortgages underlying the senior wraparound mortgage, the major problem here is that, once again, there is no indication that the financing scheme was structured in such a way as to make a default on the part of the sponsor virtually inevitable. The junior wraparound mortgage requires that the aggregate principal balance of the senior wraparound mortgage and any other prior mortgages never exceed that of the junior wraparound mortgage. The Attorney-General claims that in order to comply with this provision, the sponsor would have had to refinance the balance due on the senior wraparound mortgage in September of 1987 and amortize that balance in such a way that it would be no more than $155,695 in September of 1994, the due date of the junior wraparound mortgage. To accomplish this, he would have to obtain unrealistically favorable terms (that is, at an interest rate of approximately 7%), or

else he would not be able to make the mandated payments of principal and interest without exceeding the monthly payments of $6,250 received from the cooperative corporation. This fact was also not disclosed to the purchasers.

Accordingly, the Supreme Court properly granted plaintiff's motion for a preliminary injunction. Concur—Sullivan, Milonas and Kassal, JJ.

Murphy, P. J., and Smith, J., dissent in a memorandum by Smith, J., as follows: I dissent from the conclusion reached by the majority for three reasons. First, the order by the motion court granting preliminary injunctive relief was contrary to its own decision which stated that there was no basis for injunctive relief. Second, the Attorney-General supports his demand for injunctive relief with affidavits from an attorney without personal knowledge of the facts and without either affidavits from any of the purchasers of shares in the cooperative apartment buildings or documentary evidence. Third, the Attorney-General has not met the requirements for injunctive relief.

This is an action brought by the Attorney-General of the State of New York pursuant to section 353 of article 23-A of the General Business Law and section 63 (12) of the Executive Law in which he alleges fraudulent acts by the defendants in connection with the conversion of two buildings in Manhattan to cooperative ownership. The ultimate relief sought includes injunctive relief against the purchase and sale of securities, an injunction against any wraparound mortgage agreement, an injunction against fraudulent practices, the appointment of a receiver, and restitution.

Plaintiff brought on a motion by order to show cause returnable on July 24, 1985 seeking to preliminarily enjoin the defendants, *inter alia,* from (1) engaging in any business related to the purchase and sale of securities to the public within or from the State of New York, (2) violating the provisions of article 23-A of the General Business Law, (3) entering into any mortgage agreement as mortgagee with respect to property owned by a cooperative corporation or undergoing conversion to cooperative ownership and (4) engaging in the purchase or sale of cooperative interests in premises known as 565 Broadway or 684 Broadway in New York County.

On the return date of the motion in July 1985, the motion court vacated the temporary restraining order. When it rendered its decision in September 1986, the motion court found

plaintiff's evidence insufficient to grant injunctive relief. Nothing in the opinion states that an injunction is necessary. Nevertheless, the motion court granted an injunction in the order. The only findings made by the motion court in its decision were as follows:

"The Attorney General has not made a sufficiently clear factual showing that the events relating to the wrap around mortgage constituted a fraud to enduce [sic] the purchase of shares under the cooperative plan to warrant the drastice [sic] relief sought.

"In the absence of any factual details indicating that the existing mortgages can be modified without the cooperation of the tenants-in-possession, movant has not demonstrated a need to enjoin the mortgage transactions."

Thus the decision of the motion court stated that the evidence of fraud with respect to the wraparound mortgage was insufficient to warrant an injunction against the selling of shares, and the need to enjoin mortgage transactions had not been shown.

Because the decision does not support the granting of injunctive relief, the order granting that relief should be reversed. Where an order and a decision are in conflict, it is the decision that controls. (*Athanasiou v National Transp. Corp.*, 25 AD2d 829 [1st Dept 1966]; *Rowlee v Dietrich*, 88 AD2d 751, 752 [4th Dept 1982]; *Di Prospero v Ford Motor Co.*, 105 AD2d 479, 480 [3d Dept 1984]; *see also*, Siegel, NY Prac § 250, at 308.)

The second reason why the decision of the motion court should be reversed is the nature of the evidence offered by the Attorney-General in support of the motion for relief. It consists of the affidavit of an Assistant Attorney-General who states that he has made an investigation and gives his conclusions that the defendants engaged in fraudulent activities. No documentary or other evidence is presented in support of those conclusions.

It is incomprehensible that after allegedly conducting an investigation of more than a year in length, examining several witnesses, including defendant Fine, and examining a "multitude of documents", none of this "evidence" of fraud is produced. It is insufficient for the Attorney-General to state he has a case. He has the same obligation to produce evidence supporting the case as any other litigant. The language of this court in *Faberge Intl. v Di Pino* (109 AD2d 235, 240) is applicable here: "Preliminary injunctions are also 'drastic'

remedies which require a clear showing of likelihood of ultimate success on the merits, that the movant will suffer irreparable injury unless the relief sought is granted and that the balancing of the equities lies in favor of the movant. Proof establishing these elements must be by affidavit and other competent proof, with evidentiary detail. If key facts are in dispute, the relief will be denied *(Eljay Jrs. v Rahda Exports, 99 AD2d 408)."*

Furthermore, the evidence which was presented does not support the need for injunctive relief. In order to obtain injunctive relief, it was incumbent upon the plaintiff, as previously stated, to show a likelihood of success on the merits, irreparable injury if the relief were not granted and a balancing of equities in its favor. *(Grant Co. v Srogi,* 52 NY2d 496, 517; *Faberge Intl. v Di Pino, supra; Paine & Chriscott v Blair House Assocs.,* 70 AD2d 571 [1st Dept 1979].) Upon the evidence presented, the plaintiff did not meet its burden. Plaintiff sought to establish that the defendants, and specifically defendant Fine, had not revealed in the offering plan or amendments that because of an involved scheme of mortgage transactions undertaken by defendant Fine, the cooperative owners and the purchasers of stock in the corporations might have to pay substantial sums of money to prevent foreclosure and that Fine would benefit financially from foreclosure. In addition, the complaint alleges that Fine acted in such a way that foreclosure was inevitable. It is also alleged that Fine did not reveal certain defects in the properties.

The allegations made against the defendant Fine and the other defendants are strongly disputed.

The majority opinion states that the Attorney-General must meet what it terms a lesser standard than that of other plaintiffs in order to receive preliminary injunctive relief. It contends that "the Attorney-General 'need only show prima facie that the respondents' actions fell within the purview of the act and that, as such, they violated the act' " *(People v Glenn Realty Corp.,* 106 Misc 2d 46, 47). To the extent that the majority decision is saying that the Attorney-General need not show a likelihood of success on the merits, irreparable injury if relief is not granted or a balancing of equities in his favor, I disagree. Moreover, the Attorney-General acknowledges that the standard reiterated by the Court of Appeals in *Srogi (supra)* is the applicable standard. If this standard is eliminated for cases in which the Attorney-General brings an action on behalf of the State, the State is given an unfair and

unwarranted advantage over other litigants in the court system.

The unfairness of the standard enunciated by the majority becomes clear in a case such as this where the issues are hotly disputed. The essence of the Attorney-General's case, accepted by the majority, is that he has demonstrated with respect to the properties at 565 Broadway and 684 Broadway that important details were selectively omitted from the prospectuses. This conclusion of omission will not stand analysis to the extent of requiring a preliminary injunction without a hearing.

The evidence with respect to the building located at 565 Broadway in Manhattan will be dealt with first. Defendant Martin Fine is the principal shareholder of defendant 565 Broadway Renaissance Corp., the sponsor of a plan to convert the premises at 565 Broadway to cooperative ownership. He is also the general partner of the defendant 565 Broadway Company, a partnership alleged to be the nominal mortgagee under a wraparound mortgage encumbering the 565 Broadway premises.

An offering plan to convert 565 Broadway to cooperative ownership was filed with the Department of Law on March 30, 1979. After several amendments to the plan, it was declared effective on or about November 5, 1979 by written notice to the purchasers of loft units 3, 5 and 6. On or about November 21, 1979 a closing was held and the 565 Broadway premises were transferred to the cooperative corporation, the Prince Tower Tenants Corp. The shares allocated to loft units 3, 5 and 6 were acquired by the subscribers to those units.

Plaintiff's contention is that the offering plan and its amendments fraudulently failed to include a number of facts which should have been revealed to the purchasers of shares. Specifically, it is alleged in the complaint and other papers submitted that the offering plan omitted, *inter alia,* crucial information concerning a wraparound mortgage and a substantial defect in a waste stack.

The offering plan allegedly described a wraparound mortgage. Upon closing of title, the 565 Broadway premises would be encumbered by a consolidated wraparound mortgage in the principal sum of $420,000 for a 12-year period which would be held by the sponsor, 565 Broadway Renaissance Corp., and assumed by the cooperative corporation, the Prince Tower Tenants Corp. The wraparound mortgage would wrap around and be subordinate to two other mortgages. The first mortgage

(OD Investors Mortgage) had been created in October 1978 between OD Investors, Inc. as mortgagee and Don't Tread On Me Ltd., a corporation allegedly owned and controlled by defendant Fine, as mortgagor. At the time of the closing on the cooperative premises, the outstanding principal balance was $240,000 due and payable October 31, 1981. The second mortgage was between 39-41 Worth Street Co. as mortgagee and Amazing West 82nd Street Corp., a company allegedly owned and controlled by defendant Fine, as mortgagor. At the time of the closing on the cooperative premises, the amount due was $119,248. After payments of interest and amortization, the sum of $89,928 would be due and payable on July 1, 1989.

The complaint alleges further that defendant did not disclose key facts about the mortgage indebtedness of the property. One of these facts was that payments on the wraparound mortgage had to be sufficient to permit payment of the first and second mortgages. A second was that no amortization was being realized on the first mortgage, the OD Investors Mortgage, and that the principal sum would become due on October 31, 1981. A third fact was that at some point the payments on the wraparound mortgage would be insufficient to meet the payments required under the OD Investors Mortgage.

Contrary to the statement in the majority opinion about the absence of information concerning mortgage indebtedness in the prospectus, the offering plan for 565 Broadway revealed all of these mortgages, their due dates, the possible necessity of refinancing the mortgages if they were not paid on the due date, and the possibility of additional maintenance charges if refinancing was not successful. The section of the offering plan entitled "Mortgage Indebtedness" reads as follows:

"Upon the closing of title to the Property by the Cooperative Corporation, the Property will be encumbered by a CON-SOLIDATED WRAP-AROUND MORTGAGE (the 'Mortgage') to be held by Sponsor in the principal amount of $420,000, for a period of twelve (12) years from closing. The Mortgage is subject and subordinate to (and included within its Principal balance) a first mortgage held by O.D. Investors, Inc., which has an outstanding principal balance of $240,000 and is due and payable on October 31, 1981. The 'mortgage' will be assumed by the Cooperative Corporation.

"The 'Mortgage' is also subject and subordinate to (and includes within its principal balance) a second-mortgage in the amount of $119,248., held by 39-41 Worth St. Co., payable

semiannually on January 1 and July 1, up to June 30, 1979, at the rate of 7% per annum, interest only; and thereafter at the rate of 8% interest plus 1% amortization commencing July 1, 1979 up to and including July 1, 1982, and at the rate of 8% interest and 2% amortization from July 1, 1982 up to July 1, 1989, when the entire unpaid principal sum shall be due and payable. At that time, the aggregate principal unpaid balance shall be $89,928.00.

"These Prior Mortgages may be modified or extended or refinanced so long as the total payments under the Prior Mortgages do not exceed those under the Mortgage, and the principal balance does not exceed $420,000.

"The Mortgage requires payments of constantly *[sic]* monthly installments of $3600, including interest at 7% per annum. The monthly installments are required to be applied by the holder of the Mortgage to payments of principal and interest on the Prior Mortgages. In addition, the Mortgage permits the holder to require the deposit of a prorated monthly sum on account of real estate taxes, frontage and water and sewer charges; which charges are to be paid by the holder of the Mortgage from such sums as and when the same become due. the *[sic]* mortgage is *not* prepayable by the Cooperative Corporation, without the prior written consent of the holder.

"As the Prior Mortgages become due prior to the maturity of the Mortgage, the Mortgage provides that the holder may substitute an institutional mortgage for the Mortgage and all Prior Mortgages and/or extend, substitute or refinance either or both Prior Mortgages, provided that in any event, neither the then existing mortgage liens on the Property nor the monthly installments of principal and interest payable on such mortgage liens shall increase as a result of any such substitution, extension or refinancing. There can be no assurance, however, that the holder of the Mortgage will be able to substitute, refinance or extend the Prior Mortgages when they become due and payable. Under the terms of the Mortgage, the holder of the Mortgage would be required to make these Prior Mortgage payments, but in the event that holder failed to make such payments, the Cooperative Corporation would have to do so or to *[sic]* refinance the Prior Mortgages in order to prevent a foreclosure of either or both Prior Mortgages. In *order* to make these payments, it may be necessary for the Cooperative Corporation to increase the maintenance (rent) payable by its tenant-stockholders.

"The Mortgage becomes due on the twelfth (12) anniversary

date of the Closing Date. At that time, if all regular installments shall have been made on the Mortgage. the *[sic]* aggregate principal balance then payable will be $161,598.32. Unless the Cooperative Corporation makes arrangements to refinance or extend this Mortgage indebtedness, it will have the responsibility of paying the principal indebtedness then due, which may require additional maintenance charges. No representations are made as to the availability of funds for refinancing, the interest rate, or the cost of refinancing at the time the Mortgage becomes due. If the mortgage payments should be increased as a result of any such refinancing, then it may be necessary at that time to increase the maintenance charges to cover such increased payments.

"NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF FUNDS FOR REFINANCING OR THE INTEREST RATE AVAILABLE AT THE TIME THE MORTGAGE, OR THE PRIOR MORTGAGES, BECOME DUE."

Moreover, while demanding injunctive relief, the petitioner has not seen fit to include any of these mortgage agreements in his papers.

Turning to the allegations concerning 684 Broadway, briefly stated, it is plaintiff's contention that the prospectus did not reveal that it was to defendant Fine's advantage to default on a "Senior Wraparound Mortgage". The complaint alleges that a junior wraparound mortgage would wrap a senior wraparound mortgage, with the 684 Owners Corp. obligated to make payments to defendant Fine under the junior wraparound mortgage and defendant Fine obligated to make payments to the holder of the senior wraparound mortgage. Plaintiff alleges that at some point, it was to Fine's advantage to default on the senior wraparound mortgage and he did so. Plaintiff contends that the entire wraparound scheme was fraudulent.

None of the mortgages referred to with respect to 684 Broadway are included in the papers submitted and plaintiff's contentions are strongly disputed by defendants.

While plaintiff may have evidence of fraudulent activities which would support the motion for a preliminary injunction, that evidence has not been presented here. It should be noted that for over a year between the lifting of the temporary restraining order and the rendering of the court's decision, no injunction was in effect and no allegations of harm to the public made.

Accordingly, I respectfully dissent.