OPINION OF THE COURT
Gerald Lebovits, J.
Petitioner, Art Omi, Inc., a not-for-profit corporation, seeks in this licensee proceeding to evict Sandra Vallejos, respondent, and Pedro, her son, from a rent-stabilized apartment at 346 East 20th Street in New York county. According to Art Omi, respondent’s month-to-month tenancy has expired. According to respondent, Art Omi is an illusory tenant, and she is the real tenant.
A trial, digitally recorded, was held on January 11 and February 1, 2007. Three witnesses testified, two for Art Omi. The first was Francis Greenburger. Greenburger is Art Omi’s founder and chairman; the owner of the East 20th Street building until June 13, 2002, when he sold the building to 346-50 East 20th Street LLC, the building’s current owner, of which he is now a member; and the founder and chairman of Time Equities, Inc., a real estate company that manages the East 20th Street building and handles Art Omi’s accounting department. Ruth Adams, Art Omi’s administrative director, also testified for petitioner. Respondent testified on her own behalf. The court credits the testimony of all three witnesses.
Art Omi contends that if the court were to rule for respondent, the court would confirm the saying that “no good deed goes unpunished.” But Art Omi did no “good deed.” Respondent did the good deed, not Art Omi. The court finds that Art Omi is an illusory tenant and that respondent is the real tenant. Art Omi, the prime tenant, acted as Time Equities’s straw man when Art Omi subleased the apartment to respondent. Art Omi never occupied or intended to occupy the apartment as its home and had no dominion and control over the apartment. Art Omi, Time Equities, and 346-50 East 20th Street LLC colluded in the scheme. They circumvented the rent laws and profited. They led respondent to believe that she could continue in possession as a rent-regulated tenant. Although she paid the monthly rent during her 11-year tenancy, she was compelled to a large extent to allow Art Omi’s occupants to stay in her apartment for free. When Time Equities received the monthly rent, it would split it in half: Time Equities kept half; Art Omi kept the other half. Everyone profited except respondent. Law and equity dictate that respondent should be the real tenant.
*872 I. Findings of Fact
In 1994, respondent, an artist and teacher, left her home in Argentina to participate in Art Omi’s summer residency program, which is located in Ghent, Columbia County, New York. Art Omi hosts its residency program — an artists’ colony— for international artists, writers, and musicians. Art Omi gives residents free room and board and a place to create and exhibit their art. Greenburger founded Art Omi 15 years ago. Since then, Art Omi has given international artists a unique and special opportunity, for the sake of art and human betterment, to work and network with other artists in the United States. Respondent met Greenburger during her residency program.
When respondent finished the residency program, she contacted Greenburger to help her find an apartment in New York City. Greenburger told her to contact Time Equities, his company. On November 1, 1994, respondent entered into a month-to-month sublease agreement with Time Equities for an apartment on West 12th Street for $1,300 a month. Respondent lived in the apartment with her husband and son. After suffering marital and financial difficulties, respondent contacted Greenburger sometime in 1995 to help her secure a cheaper apartment for herself and her son. Greenburger again suggested that she contact Time Equities. Respondent did so.
Time Equities needed a tenant, respondent needed an apartment, and Art Omi needed an apartment in New York City where its artists could stay. The parties therefore executed two agreements for the subject apartment at East 20th Street: one between Time Equities and Art Omi, the other between Art Omi and respondent. Greenburger and Linda Cross, Art Omi’s executive director, conceived of the idea for Art Omi to rent the subject apartment and then to sublease it to respondent.
On November 1, 1995, Art Omi entered into a one-year lease with Time Equities, with a monthly rent of $605.56. (Petitioner’s exhibit 5.) Cross signed the lease on Art Omi’s behalf. When the lease was executed, Greenburger was the building’s owner. Art Omi never paid security to anyone.
Two weeks later, on November 15, 1995, respondent and Greenburger, on Art Omi’s behalf, agreed that respondent would “share with Art Omi apartment No. 30 at 346 East 20th Street.” (Petitioner’s notice to admit, exhibit E.) Respondent would “make a contribution of $605.56 a month to Art Omi.” (Id.) Art Omi would deem $302.78 of that amount as “rent” and the remainder a “donation.” (Id.) In return, respondent would use *873 one bedroom but share with Art Omi’s “occupants” the living room, kitchen, and bathroom, and Art Omi’s occupants would use respondent’s second bedroom. (Id.) Respondent would pay for telephone and electrical service, and Art Omi’s occupants would use respondent’s telephone for local calls for free. (Id.) On 30 days’ notice, either party could terminate the agreement. (Id.)
Respondent paid the rent for the apartment from 1995 until 2007. Division of Housing and Community Renewal records from 1995 through 2005 list Art Omi as the apartment’s tenant of record and confirm that respondent was paying the legal regulated rent. Respondent would send Time Equities a check payable to Art Omi; Time Equities deposited the check; and Time Equities would keep half the money and give the other half to Art Omi. Rent breakdowns that Time Equities sent to respondent show that half the money respondent sent to Time Equities was marked “rent” and the other half as a “contribution.” A rent breakdown from October 1999 reveals that $330.64 represented respondent’s “rent” and $330.64 represented her “contribution.” A rent breakdown from 2001 to 2003 reveals that $364.49 represented respondent’s “rent” and $364.49 represented her “contribution.” Art Omi never wrote a rent check or otherwise transferred consideration to Time Equities, the management company; to Greenburger, the former owner; or to 346-50 East 20th Street LLC, the current owner. Whenever respondent needed repairs to the apartment, she contacted Time Equities. Whenever respondent was late with the rent, she received notices — at least five — from Time Equities.
In 1994, when respondent was at Art Omi’s summer residency program in its Ghent, New York, artists’ colony, she contributed some of her artwork to Art Omi. In 2002, after consulting with a tax advisor, Art Omi sent respondent a letter acknowledging her 1994 donation of three artworks, valued at $1,500 a piece. (Respondent’s exhibit A.) Art Omi advised respondent to consult her tax advisor to establish the deductible amount for her personal income taxes. Respondent never received a statement for the charitable contributions — half the rent — she gave every month. On her personal income tax return, respondent never deducted the charitable contributions — half the rent and the artwork — she gave to Art Omi. In Art Omi’s 2003 publicity brochure, Art Omi acknowledged about 250 persons or organizations for contributing money, for gifts up to $99, $100 to $499, $500 to $999, $1,000 to $1,999, $2,000 to $4,999, $5,000 to *874 $10,000, and over $10,000. (Petitioner’s exhibit 4.) Respondent’s name does not appear as a contributor.
Art Omi’s financial statements from 2002 to 2003 show that respondent donated $4,374 to Art Omi’s artists program. (Petitioner’s exhibit 10.) That amount represents half the rent she paid during that time period: $728.98 monthly rent multiplied by 12 months, divided by two. Art Omi’s financial statements from 2003 to 2004 state that respondent donated $4,702 to Art Omi’s artists program. (Petitioner’s exhibit 11.) That amount represents half the rent she paid during that time period: $783.65 monthly rent multiplied by 12 months, divided by two. Art Omi’s financial statements from 2006 state that respondent contributed $4,701.90 on October 1, 2006, $391.82 on October 23, 2006, and $391.82 on December 13, 2006. (According to the court’s calculations, this sum might represent part of respondent’s 2005 contribution, although Art Omi counted it toward 2006, when her monthly contribution was higher than it was until the latter part of 2005: $783.65 multiplied by 12 months, divided by two.)
Between 1995 and 2005, Art Omi’s occupants — approximately 10 to 15 individuals — shared the apartment with respondent. The occupants were Art Omi artists, some of whom were respondent’s friends. When two of respondent’s friends, also Art Omi artists, asked respondent to stay with her, respondent told them to contact Time Equities for approval. The occupants would use respondent’s second bedroom — Pedro’s bedroom— and Pedro would sleep on the couch. Occupants, uncomfortable about putting Pedro out of his room, slept on the living room sofa. Most occupants stayed for one to three nights. One of Art Omi’s occupants shared the apartment with respondent for a month. Respondent had the plausible right to refuse Art Omi’s occupants. Sometime in 1997, respondent refused an occupant because her mother had come from Argentina to stay with her. Also, in November 2005, respondent, who was then recovering from surgery, was unable to share the apartment with any Art Omi occupant. Art Omi and its occupants did not have any furniture or keep any personal belongings in the apartment. No one from Art Omi except Adams visited the apartment; she visited the apartment once, in 2002.
Art Omi and Time Equities entered into six lease renewals from November 1, 1996 until October 31, 2007. The monthly rent increased with every renewal — from $605.56 in 1995 to 1996, to $635.84 in 1996 to 1997, to $661.27 in 1997 to 1999, to *875 $687.72 in 1999 to 2001, to $728.98 in 2001 to 2003, to $783.65 in 2003 to 2005, to $826.75 in 2005 to 2007. Respondent, not Art Omi, paid all the rent increases. Cross or Adams (Art Omi’s representative) and Tom Morgan (346-50 East 20th Street LLC’s representative) signed most of the leases. Three times respondent received and signed two-year renewal leases from Time Equities for the apartment: one lease for November 1, 2001 to October 31, 2003; a second lease covering November 1, 2003 to October 31, 2005; and a third in 2005 in her name.
In a letter dated September 27, 2005, Greenburger, on Art Omi’s behalf, informed respondent that it was terminating her month-to-month tenancy effective October 31, 2005. Art Omi also sent respondent a 10-day notice to quit the apartment by December 28, 2005.* Art Omi began this proceeding in January 2006.
II. Conclusions of Law
A series of factors determine whether a court must find an illusory tenancy. As applied to the facts, all the factors favor respondent. Art Omi is an illusory tenant. Respondent is the real tenant.
A. Factors Generally for Illusory Tenancies
An illusory tenancy is created when a prime tenant subleases an apartment to deprive the subtenant of Rent Stabilization Law (RSL) rights or to profiteer. (Matter of Badem Bldgs. v Abrams, 70 NY2d 45, 52-53 [1987]; Primrose Mgt. Co. v Donahoe, 253 AD2d 404, 405 [1st Dept 1998]; Matter of Avon Furniture Leasing v Popolizio, 116 AD2d 280, 284 [1st Dept 1986], lv denied 68 NY2d 610 [1986].) In the first scenario, a tenant who acts as the landlord’s straw man or alter ego subleases an apartment so that a landlord can circumvent the rent laws. In the second scenario, a tenant is in the business of renting a rent-regulated apartment and then subleases it for profit. Both scenarios exist here. Art Omi, together with Time Equities, deprived respondent of her RSL rights. And Art Omi and Time Equities profited from the arrangement.
Courts look at several factors to determine whether a tenancy is illusory. One factor is whether the prime tenant ever occupied or intended to occupy the premises for residential use. A second is whether the prime tenant had dominion and control over the apartment. A third is whether the prime tenant and the landlord *876 colluded in the scheme or whether the landlord had constructive knowledge of it. A fourth is whether the subtenant reasonably expected to continue in possession indefinitely as a rent-regulated tenant when the sublease ends. A fifth is whether the prime tenant profited by overcharging the subtenant. These factors are “indicia that a tenancy is illusory and not as prerequisites to such a finding.” (Bruenn v Cole, 165 AD2d 443, 447 [1st Dept 1991].) No single factor is determinative.
The courts have “formulated remedies to prevent the use of illusory tenancies to evade the provisions of the Rent Stabilization Code and to prevent illusory tenants from violating the rights of bonafide tenants occupying stabilized property.” (Matter of Badem Bldgs., 70 NY2d at 53.) The illusory-tenancy defense is a judicial attempt to accomplish fundamental fairness. (270 Riverside Dr. v Wilson, 195 Misc 2d 44, 50 [Hous Part, Civ Ct, NY County 2003].) When a tenant raises an illusory-tenancy defense, a court must ask the following question: “Is the prime tenant a legitimate resident who is merely protecting his valuable property rights during a temporary absence from his home, or is he a businessman in an illegal middle market?” (Rocconi v Strong, 132 Misc 2d 190, 193 [Yonkers City Ct 1986].)
The RSL does not protect a prime tenant whose “claim to the subject premises is based on less than the need for a place to call home.” (Bruenn, 165 AD2d at 447 [finding illusory tenancy because, in part, prime tenant never occupied apartment as a home after she left apartment to pursue studies in another state].) A fact favoring an illusory tenancy is whether the prime tenant ever occupied or intended to occupy the premises as a home. (Avon Furniture Leasing, 116 AD2d at 284 [noting that prime tenant rented apartment only to sublet it]; Yellon v Reiner-Kaiser Assoc., 89 AD2d 561, 562 [2d Dept 1982]; Hutchins v Conciliation & Appeals Bd., 125 Misc 2d 809, 818 [Sup Ct, NY County 1984]; Greer v Erwin, NYLJ, Sept. 22, 1993, at 22, col 6 [Hous Part, Civ Ct, NY County].) A court will find an illusory tenancy even if a prime tenant occupies an apartment for a lengthy period but later does not intend to occupy the apartment as a primary residence. (Oxford v Clayton, NYLJ, Nov. 19, 1985, at 7, col 1 [App Term, 1st Dept] [finding illusory tenancy when prime tenant of rent-stabilized apartment had not occupied or intended to occupy premises for more than a decade].)
To determine whether , a prime tenant intended to use the premises as a home, courts look to the prime tenant’s ties to the *877 premises. A fact favoring an illusory tenancy is whether the prime tenant’s occupancy is tangential. (Clinton & Churchill Servs., Inc. v Sims, NYLJ, Apr. 15, 1992, at 26, col 5 [Hous Part, Civ Ct, Kings County] [noting that prime tenant resided and retained all important legal contacts in Great Neck, not in Brooklyn, where premises were located].) Another fact helpful to an illusory-tenancy defense is whether the prime tenant is always absent from the premises, not merely temporarily absent. (Rocconi, 132 Misc 2d at 191 [finding illusory tenancy because, in part, prime tenant maintained separate residence near apartment].)
Applying these factors requires that the petition be dismissed.
B. Whether the Prime Tenant Occupied or Intended to Occupy the Premises as a Home
Art Omi never occupied or intended to occupy the apartment as its home. Art Omi’s ties to the apartment were tangential. No one but respondent maintained the apartment as a primary residence. Art Omi and respondent’s November 1995 agreement proves that Art Omi never intended to use the apartment as its home. Respondent agreed to “share [the apartment] with Art Omi.” (Petitioner’s notice to admit, exhibit E.) Respondent would use one bedroom and share the living room, kitchen, and bathroom. (Id.) Art Omi’s occupants would use respondent’s second bedroom. (Id.) Art Omi shared the apartment with respondent but never kept the apartment as its home. Art Omi sent approximately 10 to 15 occupants to the apartment between 1995 and 2005. None of these occupants kept personal belongings or furniture in the apartment. Most of the occupants stayed for one to three nights. Respondent, the real tenant, was the only one who had the plausible power to accept or reject occupants. She rejected two occupants during her tenancy: one in 1997, when respondent’s mother from Argentina was visiting her, and another in November 2005, when respondent was recovering from surgery. The only individual who visited the apartment on Art Omi’s behalf was Adams, and she visited only once. Sending an Art Omi staff member to visit the apartment one time in 10 years shows that Art Omi did not use the apartment as its home. Sending 10 to 15 occupants to stay for one to three nights, or at most one month, in a 10-year period also shows that Art Omi did not use the apartment as its home. This demonstrates not merely Art Omi’s temporary absence from the apartment. It demonstrates a total absence.
*878 C. Whether the Prime Tenant Had Dominion and Control over Premises
To determine whether a prime tenant has dominion and control, a court looks at whether the prime tenant collected rent from the subtenant, paid any rent and security to the landlord or managing company, and signed any document affecting possession of the apartment. (Bruenn, 165 AD2d at 449; Yellon, 89 AD2d at 562; Clinton, NYLJ, Apr. 15, 1992, at 26, col 5.) That a subtenant pays rent to the managing company or owner, and not to the prime tenant, suggests that the prime tenant never had dominion and control over the premises. (See Envoy Towers Assoc. v Dias, 15 Misc 3d 1104[A], 2006 NY Slip Op 52583[U], *4 [Hous Part, Civ Ct, NY County 2006] [finding illusory tenancy because, in part, landlord accepted dozens of checks from subtenant]; Clinton, NYLJ, Apr. 15, 1992, at 26, col 5.) That the prime tenants paid rent with their own personal checks suggests that the prime tenants exercised dominion and control over the premises. (See 270 Riverside Dr., 195 Misc 2d at 46.) If the owner, not the prime tenant, negotiates and signs the sublease agreement with the subtenant, that suggests that the prime tenant had no dominion and control. (Clinton, NYLJ, Apr. 15, 1992, at 26, col 5.)
The more passive the prime tenant’s role, the more likely an illusory-tenancy finding. (Bruenn, 165 AD2d at 449 [finding illusory tenancy because, in part, landlord had dominion and control over apartment whereas prime tenant’s role was passive].) In Bruenn, the prime tenant’s mother, who managed the building, signed the original lease and sublease agreement and collected rent from the subtenant. (Id.) The prime tenant’s father, a principal in the building, paid the prime tenant’s rent. (Id.) The Bruenn court noted that, given their relationship with the owners and managing company and their connection to the apartment, the prime tenant’s mother and father acted as the landlord, not as the prime tenant or on the prime tenant’s behalf. (See id.) The Bruenn court found an illusory tenancy because the prime tenant never signed the original lease and sublease, never collected rent from the subtenant, and never paid rent to the landlord. (See id.)
Like the prime tenant in Bruenn, Art Omi had no dominion and control over the apartment. Art Omi’s role was passive: Art Omi never paid security for the apartment, never collected rent from respondent, and never wrote a rent check to Time Equities or the building owner during respondent’s 11-year tenancy. *879 Instead, respondent paid the monthly rent with a personal check to Time Equities, the management company. She made the checks payable to Art Omi. Greenburger, originally the building owner and later a member of the LLC that owns the building, negotiated and signed the November 1995 agreement. Taken together, these facts demonstrate that Art Omi never had dominion and control over the apartment.
D. Whether the Prime Tenant Colluded with the Landlord
Although not an essential prerequisite, a fact favoring an illusory tenancy is whether the landlord and prime tenant colluded. (Avon Furniture Leasing, 116 AD2d at 285 [finding that although owner and prime tenant never colluded, owner derived substantial benefits from scheme and was aware of prime tenant’s activities].) Sufficient for an illusory-tenancy finding is whether the landlord “kn[e]w or should have known of the subterfuge” between subtenant and prime tenant. (Primrose, 253 AD2d at 405-406; cf. West 46 Equities, Inc. v Henry, NYLJ, Sept. 8, 1997, at 26, col 6 [App Term, 1st Dept] [finding no illusory tenancy when landlord neither knew of subtenants nor derived benefit from subtenants; subtenants gave prime tenants cash payments, and prime tenant paid rent directly to landlord].) When a landlord rejects a subtenant as the real tenant or does not know about a subtenant’s presence, a court is less likely to find an illusory tenancy. (See 390 W. End Assocs. v Kornbluth, NYLJ, Nov. 16, 1990, at 24, col 6 [App Term, 1st Dept] [finding no illusory tenancy, given that landlord had not accepted subtenant as a tenant]; Envoy Towers Assoc., 15 Misc 3d 1104[A], 2006 NY Slip Op 52583[J], *4 [2006] [finding illusory tenancy because, in part, landlord knew about subtenant for 13 or 14 years]; 270 Riverside Dr., 195 Misc 2d at 51 [finding no illusory tenancy because subtenants took no affirmative step to apprise landlord of their presence: prime tenants executed renewal leases in their names, paid rent with their own personal checks, had electricity bills in their names, and signed for repairs].)
Although proof of collusion is not necessary to establish an illusory tenancy, collusion exists here. Art Omi colluded with Time Equities and Greenburger. Time Equities and Green-burger knew of respondent’s presence in the apartment, and respondent took affirmative steps to apprise them of her presence. Respondent contacted Greenburger and Time Equities in 1994 and 1995 when she needed an apartment. Time Equities knew in advance about the November 1995 deal that Art Omi, through Greenburger, and respondent negotiated. When respondent paid *880 the monthly rent, she sent personal checks with her name on them to Time Equities. Time Equities deposited respondent’s checks. Respondent contacted Time Equities whenever she needed repairs in the apartment. Time Equities knew and benefitted from Art Omi’s arrangement with respondent. Time Equities kept half the rent money and gave the other half to Art Omi.
E. Whether the Subtenant Reasonably Expected to Continue in Possession
Another fact favorable to an illusory-tenancy defense is whether the subtenant reasonably expected to continue in possession once the lease ends. (Cf. Blum v Curtis, NYLJ, May 26, 1989, at 21, col 1 [App Term, 1st Dept] [noting that subtenants did not reasonably expect to continue in possession indefinitely as rent-regulated tenants upon termination of six-month sublease because they never exercised their option to purchase apartment once it converted to condominium unit].) Respondent has resided in the subject apartment since 1995 — an 11-year tenancy. After the fourth or fifth year of a tenancy, any tenant would reasonably expect to continue in possession. Also, respondent expected to continue in possession because she received three renewal leases in her name: a renewal lease for November 1, 2001 to October 31, 2003; a renewal lease covering November 1, 2003 to October 31, 2005; and a third renewal lease toward the end of 2005. Art Omi argues that Time Equities sent these renewal leases to respondent inadvertently. Even if true, that inadvertently led respondent to believe that she could continue in possession beyond her month-to-month tenancy.
E Whether the Prime Tenant Profited
Also favoring an illusory tenancy is whether the prime tenant profits at the subtenant’s expense. Overcharging a subtenant is profiteering. (Primrose, 253 AD2d at 405; Hutchins, 125 Misc 2d at 810, 818 [noting that prime tenant used apartment for commercial purposes when it made 100% profit]; Clinton, NYLJ, Apr. 15, 1992, at 26, col 5 [noting that prime tenant charged subtenant rent exceeding lower rent-stabilized rent level — over 100% profit]; Greer, NYLJ, Sept. 22, 1993, at 22, col 6 [finding that prime tenant overcharged subtenant more than double the legal rent].) Holding onto an apartment to speculate and profit from a possible cooperative conversion is also profiteering. (Avon, 116 AD2d at 284-285; Yellon, 89 AD2d at 562-563; Rocconi, 132 Misc 2d at 192.) Art Omi and Time Equities never *881 overcharged respondent in the classic, traditional sense: respondent paid the legal regulated rent for the apartment. But Art Omi and Time Equities profited at respondent’s expense in two different ways nonetheless.
Art Omi and Time Equities profited, first, because Art Omi had a hostel in Manhattan — respondent’s apartment — for its artists to stay for free.
Art Omi and Time Equities also profited by funneling respondent’s money through a peculiar accounting system. Time Equities (the management company) took rent money from a subtenant (respondent). Instead of giving the money to the owner (Greenburger and, later, his LLC), it kept half and gave the other half to its prime tenant (Art Omi) as the charitable contribution of the subtenant (respondent). It did not, however, give the subtenant any acknowledgment for personal income-tax-deduction purposes. And in any event, the subtenant (respondent) had no right to claim any tax deduction because the money was for residential rent.
The accounting method occurred as follows: respondent paid the entire monthly rent, but Time Equities used only half of it to pay the rent; it gave the other half to Art Omi. In its financial statements, Art Omi accounted for half the rent as respondent’s “donation” or “contribution” to itself, a not-for-profit corporation. Time Equities sent respondent rent breakdowns showing that Time Equities deemed half the money respondent sent to Time Equities as “rent” and the other half a “contribution” to Art Omi. A rent breakdown from October 1999 shows that $330.64 represented respondent’s “rent” and $330.64 represented her “contribution.” A rent breakdown from 2001 to 2003 shows that $364.49 represented respondent’s “rent” and $364.49 represented her “contribution.”
Art Omi and Time Equities used the terms “donation” or “contribution” to give respondent the false impression that half her rent — a donation to a not-for-profit corporation — would be tax deductible. This was not a typical donation to a not-for-profit corporation in which donors may deduct the amount on their income taxes. Respondent had to pay the full monthly rent to stay in the apartment. Respondent never received a statement from Art Omi for the donation — half the rent — she gave every month. On her personal income taxes, respondent never deducted the donations she gave to Art Omi. Art Omi never acknowledged respondent for any of her cash donations or contributions. Art Omi never acknowledged respondent in its *882 2003 publicity brochure: respondent’s name does not appear as a contributor in this brochure. If Art Omi had sent respondent an acknowledgment of her monetary contributions in the form of half the rent, respondent could not legally have deducted any amount on her personal income taxes. Tenants who do not use part of their residence for a business purpose may not deduct personal expenses, including rent, on their personal income taxes. (Internal Revenue Code [26 USC] §§ 162, 262.) Art Omi must have known that, and it cannot have things both ways. If Art Omi had believed that respondent’s monetary contribution was a legitimate donation to a not-for-profit corporation, then Art Omi was overcharging respondent and making a 100% profit. In that scenario, only half of her money would be the rent portion and the other half would be Art Omi’s profit.
Although neither Art Omi nor respondent offered the testimony of a tax expert at trial or introduced into evidence any corporate or personal tax returns, the court surmises that Art Omi’s arrangement with respondent — that half the monthly rent would be considered a charitable contribution — was for Art Omi’s benefit or for Time Equities’s benefit, or both — but not for respondent’s benefit. In Art Omi’s financial statements from 2002 to 2003, Art Omi calculated that respondent donated $4,374, half the rent she paid during 2002 to 2003. Art Omi’s financial statements from 2003 to 2004 state that respondent donated $4,702 to Art Omi’s artists program, or half the rent she paid from 2003 to 2004. Art Omi took advantage of the arrangement with respondent because it accounted for respondent’s money as a donation: Art Omi’s income.
III. Conclusion
Art Omi deprived respondent of her rights under the RSL. It deprived her of a lease, in her name, for the apartment. And Art Omi and Time Equities profited. In circumventing the rent laws, respondent could have been evicted at any time for any reason. No equitable or legal basis exists to apply the RSL to protect Art Omi’s tenancy.

 Respondent has withdrawn her defense that she is a month-to-month tenant and that the notice to quit was deficient.